[No. B231667. Second Dist., Div. Four. Oct. 4, 2012.]

FOOD SAFETY NET SERVICES, Plaintiff, Cross-defendant and Respondent, v.
ECO SAFE SYSTEMS USA, INC., Defendant, Cross-complainant and Appellant.

## COUNSEL

McKiernan Law Firm and Stanley W. McKiernan for Defendant, Cross-complainant and Appellant.

Lewis Brisbois Bisgaard & Smith, Kenneth D. Watnick and Steven H. Frackman for Plaintiff, Cross-defendant and Respondent.

## OPINION

**MANELLA, J.**—After respondent Food Safety Net Services (Food Safety) sought to recover its fee from appellant Eco Safe Systems USA, Inc. (Eco Safe), for performing a study of Eco Safe's food disinfection equipment, Eco Safe asserted a cross-complaint against Food Safety for breach of contract, negligence, fraud, and related claims. The trial court granted summary judgment in favor of Food Safety on Eco Safe's claims, concluding that they failed in light of (1) a limitation of liability clause in the parties' contract, (2) Eco Safe's failure to establish fraud or deceit, and (3) the absence of evidence that Eco Safe suffered damages from the study. Following the grant of summary judgment, the court reclassified the action on Food Safety's complaint as a limited civil action and issued an award of attorney fees to Food Safety under Civil Code section 1717. On appeal, Eco Safe challenges the grant of summary judgment and fee award. We affirm.

### RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

There are no material disputes regarding the following facts: Eco Safe markets ozone-based food disinfection equipment. In 2006 and 2007, Eco

Safe engaged in preliminary discussions with the Carl's Jr. restaurant chain (Carl's Jr.), which is owned by CKE Restaurants, Inc. Later, Eco Safe entered into an agreement with Food Safety, which is a testing agency. Under the agreement, Food Safety was to perform a "challenge study" of Eco Safe's equipment.

In a report dated May 21, 2008, Food Safety stated that it had examined the efficacy of Eco Safe's equipment in eliminating pathogenic bacteria from lettuce and tomatoes. According to the report, Food Safety compared an ozone wash solution from Food Safety's equipment with a chlorine rinse and a tap water control rinse. Under the testing protocol, Food Safety inoculated samples of lettuce and tomatoes with three kinds of pathogens (E. coli, Salmonella, and Staphylococcus aureus), thereby creating six combinations of produce and pathogen. With respect to each combination, Food Safety gave the pathogen a predetermined opportunity to incubate on the produce. After ascertaining the "density" of the pathogen, Food Safety washed samples of the produce with each solution and reassessed the pathogen's density. During the tests, Food Safety found that the prewash pathogen density was relatively high for only one combination of pathogen and produce (E. coli in lettuce). Regarding this combination, Food Safety determined that the ozone solution was significantly more effective than its competitors in reducing the pathogen's density. In the case of the remaining combinations, which displayed relatively low prewash densities, Food Safety found no significant difference in efficacy between the ozone solution and the chlorine rinse.[1]

In June 2008, Eco Safe issued a press release describing the challenge study results as "excellent." The release quoted Michael Elliot, Eco Safe's President, as stating that the study "found significant benefits from using ozone rather than chlorine disinfection." Eco Safe also told Todd Huetinck, a quality assurance manager for Carl's Jr., that it was "very pleased" with the results. In September 2008, Huetinck responded that Carl's Jr. was not interested in using Eco Safe's equipment in its restaurants.

In September 2009, after Eco Safe failed to pay Food Safety for conducting the challenge study, Food Safety initiated the underlying action, asserting

---

[1] On this matter, the May 21, 2008 report stated: "In the cases where the inoculum was recovered at lower levels, the chlorine was insignificantly more effective than the ozone." On June 13, 2008, Food Safety issued a slightly modified version of the report which stated: "The data also showed that the ozone and chlorine washes may be statistically equivalent in efficacy on products with a low bacterial load."

claims for an open book account, account stated, and services rendered. Food Safety alleged that it was entitled to $10,171.26 for conducting the study. In November 2009, Eco Safe filed a cross-complaint against Food Safety. Eco Safe's first amended cross-complaint (FACC) contained claims for negligence, breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, and deceit.

In July 2010, Food Safety sought summary judgment or adjudication on the FACC. Food Safety contended, inter alia, that (1) a contract term limiting Food Safety's liability barred the claims for breach of contract, breach of the implied covenant, and negligence, (2) there was no actionable fraud or deceit, and (3) Eco Safe could demonstrate no damages from the misconduct alleged against Food Safety.

After granting the motion for summary judgment, the trial court awarded $56,100 in attorney fees to Food Safety under a contractual fee provision. On January 19, 2011, judgment was entered in accordance with these rulings, and Food Safety's complaint was transferred to a court of limited jurisdiction.[2]

## DISCUSSION

Eco Safe contends the trial court erred in granting summary judgment and awarding attorney fees to Food Safety. For the reasons explained below, we disagree.

### A. *Standard of Review*

"A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail. [Citation.]" (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].) Generally, "the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].) In moving for summary judgment, "all that the defendant need do is to show that the plaintiff cannot establish at least one element of the cause of action—for example, that the plaintiff cannot prove element *X*." (*Id.* at p. 853.)

---

[2] As explained below (see pt. F., *post*), the judgment is appealable even though it does not resolve the claims in Food Safety's complaint.

" 'Review of a summary judgment motion by an appellate court involves application of the same three-step process required of the trial court. [Citation.]' " (*Bostrom v. County of San Bernardino* (1995) 35 Cal.App.4th 1654, 1662 [42 Cal.Rptr.2d 669].) The three steps are (1) identifying the issues framed by the complaint, (2) determining whether the moving party has made an adequate showing that negates the opponent's claim, and (3) determining whether the opposing party has raised a triable issue of fact. (*Ibid.*)

Although we independently review the grant of summary judgment (*Lunardi v. Great-West Life Assurance Co.* (1995) 37 Cal.App.4th 807, 819 [44 Cal.Rptr.2d 56]), our inquiry is subject to two constraints. First, we assess the propriety of summary judgment in light of the contentions raised in Eco Safe's opening brief. (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125–126 [36 Cal.Rptr.3d 6].) Second, to determine whether there is a triable issue, we review the evidence submitted in connection with summary judgment, with the exception of evidence to which objections have been appropriately sustained. (*Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 711 [81 Cal.Rptr.3d 406]; Code Civ. Proc., § 437c, subd. (c).) Here, Food Safety raised several evidentiary objections to Eco Safe's showing, which the trial court sustained in part and overruled in part. Because Eco Safe does not attack the rulings on appeal, it has forfeited any contentions of error regarding them. (*Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1181 [80 Cal.Rptr.3d 6].)

## B. *Eco Safe's Claims*

In assessing the propriety of summary judgment, we look first to Eco Safe's allegations in the FACC, which frame the issues pertinent to a motion for summary judgment. (*Bostrom v. County of San Bernardino, supra*, 35 Cal.App.4th at p. 1662 [" ' "[I]t is [the complaint's] allegations to which the motion must respond by establishing . . . there is no factual basis for relief on any theory reasonably contemplated by the opponent's pleading. [Citations.]" ' "].) Here, the FACC alleged that in 2006, Eco Safe's president Elliot met with representatives of Carl's Jr. to discuss the placement of Eco Safe's equipment in Carl's Jr. restaurants, which used chlorine-based food disinfection. On behalf of Carl's Jr., Huetinck proposed procedures for a comparative study of Eco Safe's equipment and chlorine-bas ed disinfection. Further preparations for the study were made by Eco Safe and Food Safety, which the complaint characterized as an "independent testing laboratory."

Regarding Eco Safe's contract with Food Safety, the FACC alleged that on December 4, 2007, Food Safety presented Eco Safe with a written offer entitled "Draft Proposal Challenge Study" (Draft Proposal), which Elliot reviewed in conjunction with another document entitled "Laboratory Testing

Standard Terms and Conditions" (Standard Terms), which Food Safety also submitted. Copies of both documents were attached to the complaint as exhibits A and B and incorporated by reference. The FACC stated: "Eco Safe accepted the offer and commissioned the [study] pursuant to the written terms provided in [the exhibits]." Under the terms of the Draft Proposal, Food Safety agreed to conduct six separate tests. In each test, samples were to be inoculated with a specified number of "Colony Forming Units" (CFU's), which would be allowed to incubate for a set period before being treated with a water, chlorine, or ozone rinse.

The FACC further alleged that Food Safety failed to conduct the tests as specified. Only one test displayed the expected bacterial growth following inoculation, namely, the test in which Eco Safe's equipment clearly surpassed other disinfection methods. In contrast, the remaining tests showed "astonishingly low bacterial contamination levels" on the food samples, demonstrating that Food Safety failed "to inoculate at the agreed upon level" or that "[n]early all the bacteria died during incubation." The FACC asserted that "the . . . five tests simply were not the tests commissioned of [Food Safety]."

In asserting a claim for breach of contract, the FACC alleged that Food Safety had breached its contract with Eco Safe because the "deeply flawed" study was "not conducted as proposed" and "provided unsupported conclusions." Regarding the bad faith claim, the FACC alleged that Food Safety breached the implied covenant of good faith by employing "slovenly procedures which seemed to be slanted towards a preconceived conclusion," rather than "modern day scientific and laboratory procedures." Similarly, in connection with the negligence claim, the FACC alleged that Food Safety had "failed to exercise due care in properly inoculating the [samples in] the last five tests as required under the [c]hallenge [s]tudy."

Regarding the claims for fraud and deceit, the FACC alleged that prior to the study, Food Safety falsely stated that it had "skilled technicians capable of conducting a fair, accurate and impartial [c]hallenge study," and that the samples in the six tests would be inoculated with a specified number of CFU's. The FACC further alleged that the study falsely stated that the samples had been inoculated in this manner. According to the FACC, Food Safety made the statements with knowledge of their falsity to induce Eco Safe to contract with Food Safety and accept the study's results.

### C. *Limitation of Liability Clause*

In granting summary judgment, the trial court determined that Eco Safe's negligence and bad faith claims asserted nothing more than a breach of Food Safety's contractual obligations, and that Eco Safe's claim (or claims)

for the breach of these obligations failed in light of a contract provision limiting Food Safety's liability. As explained below, we agree with these determinations.

■ Generally, "a limitation of liability clause is intended to protect the wrongdoer defendant from unlimited liability." (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 503, pp. 552–554.) Clauses of this type "have long been recognized as valid in California." (*Markborough California, Inc. v. Superior Court* (1991) 227 Cal.App.3d 705, 714 [277 Cal.Rptr. 919].) With respect to claims for breach of contract, limitation of liability clauses are enforceable unless they are unconscionable, that is, the improper result of unequal bargaining power or contrary to public policy. (*Ibid.*) Furthermore, they are enforceable with respect to claims for ordinary negligence unless the underlying transaction "affects the public interest" under the criteria specified in *Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92, 98–100 [32 Cal.Rptr. 33, 383 P.2d 441] (*Tunkl*). (*McCarn v. Pacific Bell Directory* (1992) 3 Cal.App.4th 173, 177–183 [4 Cal.Rptr.2d 109] (*McCarn*).) However, limitation of liability clauses are ineffective with respect to claims for fraud and misrepresentation. (*Blankenheim v. E. F. Hutton & Co.* (1990) 217 Cal.App.3d 1463, 1471–1473 [266 Cal.Rptr. 593]; Civ. Code, § 1668.)

Here, the Standard Terms document attached to the FACC is a one-page form containing several provisions, including a clause entitled "Limited Warranty and Limits of Liability." The clause states in pertinent part: "IN NO EVENT SHALL [FOOD SAFETY] BE LIABLE FOR INDIRECT, SPE- CIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES INCLUDING (BUT NOT LIMITED TO) DAMAGES FOR LOSS OF PROFIT OR GOOD- WILL REGARDLESS OF (A) THE NEGLIGENCE (EITHER SOLE OR CONCURRENT) OF [FOOD SAFETY] AND (B) WHETHER [FOOD SAFETY] HAS BEEN INFORMED OF THE POSSIBILITY OF SUCH DAMAGES. [Food Safety's] total liability to you in connection with the work herein covered for any and all injuries, losses, expenses, demands, claims or damages whatsoever arising out of or in any way related to the work herein covered, from any cause or causes, shall not exceed an amount equal to the lesser of (a) damages suffered by you as the direct result thereof, or (b) the total amount paid by you to [Food Safety] for the services herein covered. We accept no legal responsibility for the purposes for which you use the test results."

■ We conclude there are no triable issues whether this clause bars Eco Safe from recovering damages under its claims for breach of the contract, bad faith, and negligence. To begin, the clause is an element of the contract between Eco Safe and Food Safety. As explained in *Foxborough v. Van Atta* (1994) 26 Cal.App.4th 217, 222, fn. 3 [31 Cal.Rptr.2d 525], in seeking

summary judgment, "a defendant may rely on the complaint's factual allegations, which constitute judicial admissions. [Citations.] Such admissions are conclusive concessions of the truth of a matter and effectively remove it from the issues." This principle encompasses allegations that a contract incorporates specified terms or clauses. (*St. Paul Mercury Ins. Co. v. Frontier Pacific Ins. Co.* (2003) 111 Cal.App.4th 1234, 1248 [4 Cal.Rptr.3d 416].) Here, the FACC alleged that the contract between Eco Safe and Food Safety contained the written terms in the exhibits attached to the complaint, which included the Standard Terms document. Accordingly, this allegation constituted a binding admission by Eco Safe that its contract with Food Safety included the limitation of liability clause.

We further conclude that the clause effectively limits Food Safety's liability for breaches of contractual obligations and ordinary negligence, as nothing before us suggests that the clause is unconscionable or affects the public interest. We find guidance from *McCarn*, in which the appellate court affirmed the enforceability of a similar clause with respect to a claim for negligence. (*McCarn, supra*, 3 Cal.App.4th at pp. 177–183.) There, the pertinent clause limited a publisher's liability for errors in printing advertisements to " 'pro rata abatement of the charges payable' " for the advertisements. (*Id.* at pp. 177–178, capitalization & boldface omitted.) In finding the clause enforceable, the court placed special emphasis on the fact that the contract—though standardized in form—permitted the parties to renegotiate or eliminate the clause. (*Id.* at pp. 181–182.)

In opposing summary judgment, Eco Safe identified no evidence that the clause was the product of unequal bargaining power, that it contravened public policy, or that it affected the public interest, as specified in *Tunkl*. Accordingly, the clause regulated Eco Safe's potential recovery with respect to its claims for breach of the contract and ordinary negligence.

The clause limits Food Safety's liability for "*any* . . . damages whatsoever arising out of" the study to "the *lesser* of (a) damages suffered by [Eco Safe] as the direct result thereof, or [¶] (b) the total amount paid by [Eco Safe] to [Food Safety] for the services herein covered." (Italics added.) Because it is undisputed that Eco Safe has paid nothing to Food Safety for the study, the clause thus prohibits a recovery for breach of contract. This conclusion necessarily encompasses Eco Safe's bad faith claim, as breaches of the covenant of good faith implied within contracts are not tortious outside the context of insurance policies. (*Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 43 [86 Cal.Rptr.2d 855, 980 P.2d 407].)

■ The clause also bars Eco Safe's recovery under its claim for negligence. The trial court concluded—correctly, in our view—that the claim

asserted no tort claim because it relied exclusively on a negligent breach of the contract. (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 554 [87 Cal.Rptr.2d 886, 981 P.2d 978] [mere allegation of negligent breach of a contractual obligation is insufficient to support recovery in tort].) The claim was thus only for breach of contract. However, even if Eco Safe had alleged a claim for ordinary negligence, the limitation of liability clause would have precluded a recovery because it expressly encompassed "the negligence (either sole or concurrent) of" Food Safety.

Eco Safe contends there are triable issues regarding the interpretation of the pertinent clause because it also contains a warranty provision. Prior to setting forth the limitations on Food Safety's liability, the clause states: "In accepting analytical work, [Food Safety] warrants the accuracy of test results for the sample as submitted by you. THE FOREGOING EXPRESS WARRANTY IS EXCLUSIVE AND IS GIVEN IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED. [FOOD SAFETY] DISCLAIMS ANY OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING A WARRANTY OF FITNESS FOR PARTICULAR PURPOSE AND WARRANTY OF MERCHANTABILITY." Pointing to this provision, Eco Safe maintains that the limitation of Food Safety's liability is ambiguous in scope. Eco Safe argues that the limitation of liability is reasonably understood to apply only to a claim for breach of the express warranty, which Eco Safe did not assert. In addition, Eco Safe argues that the limitation is reasonably understood to apply only to work *actually* completed within the guidelines in the Draft Proposal, but not to work that "deviated substantially and materially" from the guidelines. We reject both contentions.

■ Because the parties submitted no extrinsic evidence bearing on the meaning of the clause, its interpretation is a question of law. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) We therefore inquire into the parties' intentions, as disclosed by the language of the contract. (*Eltinge & Graziadio Dev. Co. v. Childs* (1975) 49 Cal.App.3d 294, 297 [122 Cal.Rptr. 369].) As noted above, following the warranty provision, the clause states that "[i]n *no* event" is Food Safety liable for damages—including damages for negligence—"arising out of or *in any way related to* the work herein covered, *from any cause or causes.*" (Italics added.) In view of this broad and unqualified language, the clause must be regarded as establishing a limitation on Food Safety's liability sufficient to encompass Eco Safe's claims for breach of contract, bad faith, and negligence.

Eco Safe also contends there are triable issues whether the limitation of liability clause is an element of the contract. This contention relies on a declaration from Elliot, who stated: "The [Standard Terms] document called

for a signature and provided a line on the document for a signature. I was not satisfied with all of the terms and never signed the document. [¶] . . . There were terms on the [Standard Terms] document which seemed reasonable to me, but [Food Safety] never followed through and I never signed the document. I never intended that Eco Safe should be bound by it." Eco Safe maintains that the declaration reveals an ambiguity in the FACC's allegations regarding the Standard Terms document, namely, that the FACC could be viewed as admitting only that the contract contained some of the document's clauses, but not the limitation of liability clause, which Eco Safe characterizes as "unreasonable." We disagree.

██ Elliot's declaration cannot reasonably be regarded as showing an ambiguity in the FACC; rather, it simply contradicted the FACC's allegations. The FACC stated: "Eco Safe accepted the offer and commissioned the [study] pursuant to the written terms provided in" the Standard Terms document. In contrast, Elliot maintained that after he failed to sign the document, the parties engaged in no further discussions regarding it. Accordingly, his declaration could be understood to assert only that the document formed no part of the contract, that is, that *none* of the clauses in the Standard Terms document was incorporated into it. Elliot's declaration was ineffective to avert summary judgment, as "[a] plaintiff cannot create a triable issue through declarations that contradict the complaint's factual allegations."[3] (*Foxborough v. Van Atta, supra,* 26 Cal.App.4th at p. 222, fn. 3.) In sum, the limitation of liability clause in the Standard Terms document bars Eco Safe's recovery of damages under its claims for breach of contract, bad faith, and negligence.

---

[3] Eco Safe's reply brief suggests that Elliot's deposition testimony supports its contention that the allegation in the FACC is ambiguous. After the FACC was filed, Elliot testified in a deposition that " '[t]o [his] knowledge,' " Eco Safe "probably" accepted the terms in the Standard Terms document in entering into the contract. Eco Safe argues that the term "probably" supports the existence of a doubt regarding the allegation in the FACC. This contention fails, as " 'a pleader cannot blow hot and cold as to the facts positively stated [in the complaint].' " (*Brown v. City of Fremont* (1977) 75 Cal.App.3d 141, 146 [142 Cal.Rptr. 46], quoting *Manti v. Gunari* (1970) 5 Cal.App.3d 442, 449 [85 Cal.Rptr. 366].)

For the first time on appeal, Eco Safe's reply brief also contends that even if the FACC's allegations are not ambiguous, it should be permitted to qualify the allegations on the basis of Elliot's declaration. This contention relies on *Bahan v. Kurland* (1979) 98 Cal.App.3d 808, 812 [159 Cal.Rptr. 661], and *Kirby v. Albert D. Seeno Construction Co.* (1992) 11 Cal.App.4th 1059, 1066–1067 [14 Cal.Rptr.2d 604], which stand for the proposition that allegations reflecting mistaken conclusions of a legal character are not binding on the pleader, for purposes of summary judgment. As Eco Safe failed to raise this contention in its opening brief, it is forfeited. Nonetheless, we would reject it were we to consider it on the merits, as Elliot's declaration essentially contradicts the facts stated in the FACC, namely, that Eco Safe "commissioned the [study] pursuant to the written terms provided in" the Standard Terms document. (*St. Paul Mercury Ins. Co. v. Frontier Pacific Ins. Co, supra,* 111 Cal.App.4th at p. 1248.)

### D. *Fraud and Deceit*

In granting summary judgment, the trial court concluded that Eco Safe's claims for fraud and deceit failed in light of the economic loss rule. For the reasons discussed below, we agree.

As our Supreme Court has explained, "the economic loss rule provides: ' " '[W]here a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only "economic" losses.' " . . . The economic loss rule requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise. [Citation.] Quite simply, the economic loss rule 'prevent[s] the law of contract and the law of tort from dissolving one into the other.' [Citation.]"[4] (*Robinson Helicopter, supra,* 34 Cal.4th at p. 988.)

In view of this rule, a party alleging fraud or deceit in connection with a contract must establish tortious conduct independent of a breach of the contract itself, that is, violation of " 'some independent duty arising from tort law.' " (*Robinson Helicopter, supra,* 34 Cal.4th at p. 990, quoting *Erlich v. Menezes, supra,* 21 Cal.4th at pp. 553–554.)[5] Although conduct of this type may arise in several situations, only one is invoked by the FACC, namely, the fraudulent inducement of the pertinent contract. (*Robinson Helicopter,* at pp. 989–991.) In connection with the claims for fraud and deceit, the FACC alleged that Food Safety made certain statements with knowledge of their falsity to induce Eco Safe to contract with Food Safety and accept the study's results. According to the FACC, before conducting the study, Food Safety falsely stated that it had "skilled technicians capable of conducting a fair, accurate and impartial [c]hallenge [s]tudy," and that the samples in the six tests would be inoculated with a specified number of CFU's. The FACC also alleged that the study falsely reaffirmed that the samples had been so inoculated.

---

[4] For purposes of the rule, "[e]conomic loss consists of ' " ' "damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits—without any claim of personal injury or damages to other property. . . ." ' " [Citation.]' [Citation.]" (*Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 988 [22 Cal.Rptr.3d 352, 102 P.3d 268] (*Robinson Helicopter*), quoting *Jimenez v. Superior Court* (2002) 29 Cal.4th 473, 482 [127 Cal.Rptr.2d 614, 58 P.3d 450].)

[5] Generally, " ' "[t]he elements of fraud, which give[] rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." ' [Citation.]" (*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173 [132 Cal.Rptr.2d 490, 65 P.3d 1255].)

To establish the absence of triable issues, Food Safety presented evidence that the purported misrepresentations were true regardless of when they were made, that is, that it *actually* conducted the study in an impartial and honest manner, in accordance with the testing protocol. Food Safety relied on deposition testimony from an employee responsible for the study, who stated that it was a legitimate and "reasonable" test with no "contrived numbers." Food Safety also pointed to interrogatory responses from Eco Safe, admitting that the study's results contradicted no other study, and acknowledging that it had no evidence "that results were slanted towards a preconceived notion." In view of this showing, we conclude that Food Safety shifted the burden to Eco Safe to identify a tortious misrepresentation. This Eco Safe did not do.

In response to Food Safety's showing, Eco Safe conceded its interrogatory responses, but presented declarations and deposition testimony from two experts. Dennis Harp, Eco Safe's chief chemist, opined that five of the six tests reported in the study were "unacceptable" because their results were "meaningless," "[i]nvalid," and "worthless." He also suggested that the reported results from the five tests were "false numerical data," and that—at a minimum—they should have been presented in the study in a different manner.[6] Ata Baroudi, an expert in food quality assurance, opined that the study had not been conducted in a careful and professional manner because the low levels of prewash contaminant in five of the six tests undermined the value of the study.[7]

Although this evidence may raise triable issues regarding whether the study disappointed Eco Safe's expectations under the contract, it suggests no misrepresentation "beyond a broken contractual promise" to perform the tests appropriately pursuant to the protocol and to report the results. (*Robinson Helicopter, supra*, 34 Cal.4th at p. 988.) To establish a claim of fraudulent inducement, one must show that the defendant did not intend to honor its contractual promises when they were made. (*Tenzer v. Superscope, Inc.* (1985) 39 Cal.3d 18, 30 [216 Cal.Rptr. 130, 702 P.2d 212].) As our Supreme Court has explained, although that fraudulent intent is often established by circumstantial evidence, " 'something more than nonperformance is required to prove the defendant's intent not to perform his promise.' [Citations.]" (*Ibid.*, quoting *People v. Ashley* (1954) 42 Cal.2d 246, 263 [267 P.2d 271].) Because

---

[6] On this matter, Harp asserted: "Food Safety provided false numerical data allowing a numerical comparison, completely in error, when the results should have been stated as showing either a 'presence' or 'no presence.' " In response, Food Safety's reply brief argued that the study had, in fact, stated the results in this manner.

[7] Before the trial court, Eco Safe also identified another purported misrepresentation, namely, that Food Safety had falsely held itself out as an "independent" testing laboratory. However, as the trial court correctly noted, this contention is insufficient to avert summary judgment because it contravenes the FACC's allegation that Food Safety *is* an independent testing laboratory.

Eco Safe's showing bore only on Food Safety's actual performance under the contract, it does not demonstrate fraudulent inducement.

Furthermore, Eco Safe has identified no other theory under which Food Safety's performance involved tortious misrepresentations. Even if Eco Safe's evidence raises triable issues whether the study contains inaccuracies or falsehoods, they are not "conceptually distinct from the contract," as Food Safety's obligation to perform the tests and report the results arose exclusively from the contract. (*United Guaranty Mortgage Indemnity Co. v. Countrywide Financial Corp.* (C.D.Cal. 2009) 660 F.Supp.2d 1163, 1184.) For this reason, the alleged misrepresentations fell within the scope of the economic loss rule. (See *ibid.*) In sum, Eco Safe's claims for fraud and deceit fail for want of a triable issue of fact.

### E. *Insufficient Evidence of Damages*

In granting summary judgment, the trial court also determined that Eco Safe presented inadequate evidence of damages. As explained below, we conclude that all of Eco Safe's claims fail for want of triable issues regarding the existence of damages.

■ In connection with each of Eco Safe's claims, Food Safety maintained that Eco Safe was unable to demonstrate lost profits flowing from errors or defects in the study. Generally, "damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery." (*Frustuck v. City of Fairfax* (1963) 212 Cal.App.2d 345, 367–368 [28 Cal.Rptr. 357].) Thus, "[l]ost anticipated profits cannot be recovered if it is uncertain whether any profit would have been derived at all from the proposed undertaking. But lost prospective net profits may be recovered if the evidence shows, with reasonable certainty, both their occurrence and extent. [Citation.]" (*S. C. Anderson, Inc. v. Bank of America* (1994) 24 Cal.App.4th 529, 536 [30 Cal.Rptr.2d 286].) Under these principles, lost profits based on a future contract cannot be recovered when the contract is uncertain or speculative. (*Continental Car-Na-Var Corp. v. Moseley* (1944) 24 Cal.2d 104, 113 [148 P.2d 9]; see *Ramsey v. Penry* (1942) 53 Cal.App.2d 773, 778 [128 P.2d 399] [plaintiff was not entitled to recover compensation based on future sales of stock in the absence of evidence that stock could be sold]; *Citri-Lite Co. v. Cott Beverages, Inc.* (E.D.Cal. 2010) 721 F.Supp.2d 912, 937–938 [plaintiff could not recover lost profits based on renewal of contract when there was no evidence contract would be renewed]; *Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist.* (2004) 34 Cal.4th 960, 975–976 [22 Cal.Rptr.3d 340, 102 P.3d 257] [discussing cases].)

To show that Eco Safe was unable to demonstrate lost profits from the study, Food Safety presented evidence supporting the following version of the

underlying facts: During Eco Safe's prestudy discussions with Carl's Jr., they exchanged no agreements or other documents indicating that Carl's Jr. proposed to to buy or lease Eco Safe's equipment. According to Huetinck's deposition testimony, he never discussed entering into a contract on behalf of Carl's Jr. to buy Eco Safe's equipment.[8]

Following the discussions, Food Safety conducted the study at Eco Safe's request. In July 2008, after Eco Safe decided to publish the study, Huetinck voiced his concern to Eco Safe that "in the one test with significant contamination that ozone did not kill bacteria quickly enough." Later, on September 16, 2008, Huetinck wrote to Eco Safe, stating: "[B]ased on the literature currently available on [o]zone technology in conjunction with the [challenge study], the addition of an [o]zone rinse station within [our] restaurants does not appear to add any additional benefit to existing control points . . .. [¶] Until further scientific data can definitively validate the benefit of ozone for the purpose of produce disinfection, in the absence of any negative effects towards the food products or the individual operating the [o]zone unit, [Carl's Jr.] will not pursue any [o]zone rinsing system from Eco-Safe or otherwise."

Following this letter, Eco Safe supplied Carl's Jr. with no new data regarding the benefits of its equipment, and Elliot decided not to pursue further discussions with Carl's Jr. Regarding this decision, Elliot testified during his deposition: "Why didn't I do it[?] I have no reason. I just didn't feel like doing it." He elaborated: "[I]t's just a matter of focus. You have a small company, you have a small budget, and you assign your resources to the most effective things you can do." Elliot also testified that he decided not to communicate with Carl's Jr. as long as it employed Huetinck, whom he believed "didn't want a successful test."[9]

In view of this showing, we conclude that Food Safety shifted the burden on summary judgment to Eco Safe to demonstrate a triable issue of fact regarding its damages. However, Eco Safe did not dispute Food Safety's showing, with the exception of Food Safety's characterization of the prestudy discussions. Eco Safe submitted evidence that during the discussions, Eco

---

[8] Although Food Safety did not cite Huetinck's testimony in moving for summary judgment, it directed the trial court's attention to the testimony in its reply, and the court relied on it in granting summary judgment. As Eco Safe has raised no contention of error regarding the testimony, it has forfeited any such contention.

[9] In addition to this showing, Food Safety presented evidence that independent of its study, In-N-Out Burgers conducted its own investigation into Eco Safe's equipment and decided not to purchase or lease it. Eco Safe did not dispute these facts.

Safe supplied information regarding leasing and buying its equipment.[10] In addition, Eco Safe submitted evidence that Carl's Jr. suggested or asked Eco Safe to conduct the study.

This showing is insufficient to raise triable issues regarding Eco Safe's damages. Although there are factual disputes whether Carl's Jr. requested the challenge study, the record is devoid of evidence that Carl's Jr. intended to buy or lease Eco Safe's equipment upon completion of a defect-free study favorable to Eco Safe. Although Eco Safe gave Carl's Jr. information regarding the terms upon which it could buy or lease equipment, there is no evidence that the parties negotiated any agreement, however tentative, regarding the purchase or lease of the equipment. On the contrary, Huetinck stated that no purchase agreement was discussed. Moreover, the evidence shows that in declining to pursue further discussions with Eco Safe after the study, Huetinck relied in part on concerns regarding the unproven safety of ozone-based equipment that the study did not address. It is thus speculation that Eco Safe lost profits as the result of the purported defects in the study.

On appeal, Eco Safe maintains that the record contains evidence of damages other than lost profits, namely, costs it incurred to have consultants review the challenge study. However, because Eco Safe failed to identify this evidence to the trial court, it is not a basis for reversing summary judgment. (*Sheeler v. Greystone Homes, Inc.* (2003) 113 Cal.App.4th 908, 920, fn. 7 [6 Cal.Rptr.3d 683].) The court may properly disregard evidence not cited in the parties' separate statements when it "is not referenced, is hidden in voluminous papers, and is not called to the attention of the court at all." (*San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 316 [125 Cal.Rptr.2d 499].) Accordingly, summary judgment was properly granted on all of Eco Safe's claims.

### F. *Attorney Fees*

Eco Safe contends the trial court erred in awarding attorney fees to Food Safety under the contractual fee provision, which states: "If you default in payment for services rendered, you are responsible for reasonable collection and/ or legal fees." This unilateral fee provision is subject to Civil Code section 1717, which provides that "[i]n any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the

---

[10] Although Eco Safe's separate statement characterizes this evidence as showing that "[o]ral agreements were made during discussions to conduct [the] [c]hallenge [s]tudy," the evidence contains no reference to any such agreements.

contract or not, shall be entitled to reasonable attorney's fees . . . ."[11] (Civ. Code, § 1717, subd. (a).) Pointing to the unresolved contract-based claims in Food Safety's complaint, Eco Safe argues that the award is improper because Food Safety has not "prevail[ed] on the contract," for purposes of the statute. We disagree.

As explained in *Otay River Constructors v. San Diego Expressway* (2008) 158 Cal.App.4th 796, 807 [70 Cal.Rptr.3d 434] (*Otay River*), under Civil Code section 1717, the trial court may properly award attorney fees "to a party obtaining an appealable order or judgment in a discrete legal proceeding even though the underlying litigation on the merits [is] not final." In *Otay River*, a dispute arose among parties to a contract, one of whom filed a petition to compel arbitration under an arbitration provision in the contract. (*Otay River, supra,* 158 Cal.App.4th at p. 800.) After the petition was denied, the appellate court affirmed a fee award under Civil Code section 1717 to the petition's opponent, even though the parties to the contract contemplated the initiation of a lawsuit on the contract. (*Otay River, supra,* at pp. 801–805.) In so holding, the court concluded that the denial was appealable and constituted the resolution of the sole contract claim before the trial court in the petition proceeding. (See *PNEC Corp. v. Meyer* (2010) 190 Cal.App.4th 66, 68 [118 Cal.Rptr.3d 730] [trial court properly issued Civil Code section 1717 fee award to individual who secured dismissal of a contract action against her on grounds of forum non conveniens].)

Here, the judgment following summary judgment is appealable notwithstanding the "one final judgment" rule, which ordinarily bars an appeal from a judgment resolving a cross-complaint while leaving the complaint unadjudicated. (*Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 741 [29 Cal.Rptr.2d 804, 872 P.2d 143]; see *American Alternative Energy Partners II v. Windridge, Inc.* (1996) 42 Cal.App.4th 551, 557 [49 Cal.Rptr.2d 686].) In entering judgment on the cross-complaint, the trial court reclassified the action as a limited civil case.[12] Because the claims in Food Safety's complaint must be resolved in a limited civil case, any judgment

---

[11] As our Supreme Court has explained, "[t]he primary purpose of [Civil Code] section 1717 is to ensure mutuality of remedy for attorney fee claims under contractual attorney fee provisions." (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 610 [71 Cal.Rptr.2d 830, 951 P.2d 399].)

[12] Code of Civil Procedure section 85 provides that an action "shall be treated as a limited civil case" if, and only if, certain conditions are satisfied. Generally, "[t]he boundaries of 'limited' civil actions are narrowly and precisely delineated and defined. Pursuant to [Code of Civil Procedure] section 85 a proceeding may not be treated as a limited civil action unless all of the following conditions are satisfied: (a) the amount in controversy does not exceed $25,000; (b) the relief sought is a type that may be granted in a limited civil case; and (c) the relief sought is exclusively of a type described in the statutes, including section 86, that classify an action as a limited civil case or that provide the action is within the jurisdiction of a court presiding over limited civil cases. ([Code Civ. Proc.,] § 85.) In contrast, the statutory

regarding those claims is appealable as a matter of right only to the Superior Court Appellate Division.[13] (*Anchor Marine Repair Co. v. Magnan* (2001) 93 Cal.App.4th 525, 528 [113 Cal.Rptr.2d 284]; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 1002, p. 1059.) Under these circumstances, the judgment on Eco Safe's cross-complaint "is necessarily a final judgment and therefore appealable." (*Keenan v. Dean* (1955) 134 Cal.App.2d 189, 192 [285 P.2d 300].)

These facts also establish the propriety of the fee award under Civil Code section 1717. Although the complaint and cross-complaint were initially litigated in the same action, the judgment on cross-complaint resulted in the reclassification of the remaining litigation on the complaint as a limited case and ended the unlimited civil case. The judgment thus resolved all the contract claims in the cross-complaint upon which the unlimited case was predicated. Because the limited case is subject to significantly different procedures, including a different route of appellate review (2 Witkin, Cal. Procedure (5th ed. 2008) Courts, § 241, pp. 331–332), we conclude that the judgment amounted to the resolution of a "discrete legal proceeding," for purposes of Civil Code section 1717. (*Otay River, supra*, 158 Cal.App.4th at p. 807.)

Eco Safe's reliance upon *Frog Creek Partners, LLC v. Vance Brown, Inc.* (2012) 206 Cal.App.4th 515 [141 Cal.Rptr.3d 834] is misplaced. There, two parties entered into a contract containing an arbitration provision and then fell into a dispute, resulting in the initiation of a legal action. (*Id.* at p. 520.) While the litigation was pending, one of the parties filed an unsuccessful petition to compel arbitration within the action. (*Id.* at p. 523.) After the trial court issued a fee award under Civil Code section 1717 to the prevailing party on the petition, the appellate court reversed, concluding that the petition proceeding, though technically "a preliminary and analytically distinct proceeding in the lawsuit," was not a "distinct action." (*Frog Creek Partners, LLC v. Vance Brown, Inc., supra*, at pp. 537–543.) In contrast, as explained above, the judgment on the cross-complaint resolved every contract claim upon which the unlimited civil case relied, and is subject to a separate path of appellate review. For this reason, the judgment terminated a sufficiently independent "action" under Civil Code section 1717.

---

scheme contains a broad catchall definition of 'unlimited' civil actions, designating them as all actions and proceedings other than limited civil actions. ([Code Civ. Proc.,] § 88.)" (*Ytuarte v. Superior Court* (2005) 129 Cal.App.4th 266, 275 [28 Cal.Rptr.3d 474], italics & fn. omitted.)

[13] Because Eco Safe has not challenged the trial court's reclassification of the action as a limited civil case, it has forfeited any contention of error regarding the ruling.

## DISPOSITION

The judgment and fee award are affirmed. Food Safety is awarded its costs on appeal.

Epstein, P. J., and Willhite, J., concurred.