Filed 9/25/25  CIP Jardinette Holding v. RCMF 2018-FL2 Marathon St. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| CIP JARDINETTE HOLDING, LLC et al., | B332376 |
| Cross-complainants and Appellants, | (Los Angeles County Super. Ct. No. 20STCV07826) |
| v. | |
| RCMF 2018-FL2 MARATHON STREET, LLC et al., | |
| Cross-defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gregory Keosian, Judge.  Affirmed.

Susman Godfrey, Bryan Caforio and Samantha Fenwick for Cross-complainants and Appellants.

Brian Cave Leighton Paisner, H. Mark Mersel, Elliott Averett and Jean-Claude Andre for Cross-defendants and Respondents.

A commercial lender agreed to loan $8.8 million for a building renovation.  The loan agreement limits its liability to losses "solely caused by the fraud, gross negligence or willful misconduct of Lender."  Appellants—the borrower and its investors—sued for breach of contract after the lender declared a default and foreclosed.

We conclude that the lender is exempt from liability.  Appellants claim the lender's alleged misreading of the loan agreement was willful misconduct, but did not " ' "demonstrate harm above and beyond a broken contractual promise." ' "  (*New England Country Foods, LLC v. VanLaw Food Products, Inc.* (2025) 17 Cal.5th 703, 717 (*New England*).)  Further, the record does not show the lender "solely caused" appellants' loss.  We affirm summary judgment in favor of the lender and its assignee.

## FACTS AND PROCEDURAL HISTORY

In 2016, Robert Clippinger acquired an apartment house in Hollywood to renovate and sell (the Project).  Appellants Ratel Investments, LP, and Ratel Hollywood, LP (collectively, Ratel) agreed to invest in the Project.  Ratel does not usually manage projects and instead relies on a partner-manager.

Clippinger formed appellant CIP Jardinette Holding, LLC (Borrower) to secure major financing for the Project.  Borrower is owned by a "sole member," appellant CIP Jardinette, LLC (CIP).  Clippinger was manager of Borrower and CIP.  Ratel's $3.9 million contribution gave it a 90 percent interest in CIP; Clippinger had a 0.57 percent interest; and other investors had various interests.

Clippinger and his attorney led loan negotiations; Ratel's counsel also participated.  In December 2017, Borrower entered an agreement with respondent ReadyCap Commercial LLC

2

(ReadyCap) to loan $8,815,000 for the Project (the Loan Agreement). The loan was secured by a deed of trust on the Project property.

Clippinger signed the Loan Agreement and a guaranty accepting liability for recourse obligations. The Loan Agreement warranted that Clippinger, as guarantor, owned at least one-quarter of a percent of Borrower and "has effective legal and management control of, Borrower and the Property," and the Project "will be managed at all times by the Manager."

The CIP partnership agreement forbade Ratel and Clippinger from taking any action that would result in a loan default. It allowed Clippinger to be removed as manager for "Bad Conduct," which encompassed gross negligence, fraud, willful misconduct, misappropriation of funds, or felony conduct involving dishonesty or moral turpitude. Ratel had to seek judicial relief if Clippinger objected to his removal. If he was removed, Ratel or its designee would become manager.

The relationship between Clippinger and Ratel frayed a few months after the loan closed. Ratel was concerned by Clippinger's transfers of funds from Borrower to other entities and the lack of progress on the Project. Borrower's bank account contained $300. Ratel believed funds were misappropriated. Clippinger denied wrongdoing.

On October 4, 2018, Ratel principal Ron Sann wrote ReadyCap that Ratel had "begun the process of removing Mr. Clippinger as Manager" because he diverted funds from the Project, where construction was almost at a standstill. Sann noted that Ratel is "neither the manager of Borrower nor a direct member of Borrower," but had a financial interest in Borrower's

sole member, CIP.  Sann claimed CIP's operating agreement gave Ratel the right to remove Clippinger.

On October 5, 2018, Ratel notified Clippinger that it was removing him for bad conduct.  Sann wrote investors about the misappropriation of funds, telling them there was uncertainty going forward because "[g]aining the lenders [*sic*] cooperation, recovering funds and working with Clippinger on a transition all entail risk."

Sann spoke with ReadyCap's Dominick Scali and believed Scali approved Clippinger's removal; however, no discussions between Sann and Scali were documented or reduced to a writing showing ReadyCap supported Clippinger's removal.  Sann testified that he was uncertain if the lender would approve.  He conceded that he lacked the lender's written consent to remove Clippinger.

Scali knew Ratel accused Clippinger of misappropriation; however, the lender does not get involved in disputes between a borrower and a third party unless it affects the collateral.  Scali advised Sann that the loan was securitized into a trust and communications had to be directed to the servicer.

On October 18, 2018, ReadyCap's attorney told Ratel that it could not unilaterally replace Clippinger.  Counsel wrote, "The pending change of management would constitute a Transfer under the terms of the Loan Documents, which may not occur without the Lender's prior express written approval, and which approval may be given or withheld in the Lender's sole and absolute discretion.  Borrower has been advised that any Transfer without Lender's express written approval will constitute an Event of Default under the terms of the Loan Documents."

4

Sann decided to move forward with removing Clippinger, despite the lender's warning. He testified, "I believe that Dominick Scali had given me authorization and I felt it was at least possible that this was a lack of communication between ReadyCap and the servicer. [¶] . . . [M]ost importantly, I believed that I was not the borrower under the loan agreement and therefore, my actions were being misrepresented by this letter and I was entitled to the actions I was taking." He believed "the lender was making an error."

Clippinger objected to Ratel's effort to remove him as manager. He threatened to sue Ratel and the lender, and asserted that his removal was a default under the Loan Agreement.

On December 18, 2018, the loan servicer sent Borrower a notice of default. It wrote that Clippinger's removal as manager and guarantor, without the lender's consent, violated the Loan Agreement. It gave Borrower 30 days to cure the default by seeking consent to end the management agreement; enter an agreement with a new manager; and provide a personal guaranty of recourse obligations from a Ratel member.

Sann testified that Ratel took steps to satisfy the demand to cure the default. It asked for forms acceptable to the lender for a management agreement and guaranty, and for approval of Ratel as the replacement manager and guarantor. Despite numerous requests, Ratel never obtained the lender's consent to replace the manager.

In January 2019, Sann e-mailed the lender regarding the default notice, stating that Ratel took over management of the Project due to Clippinger's misdeeds. Clippinger had cancelled virtually all insurance for the Project; failed to pay a security

company so the Project was unguarded; failed to pick up building permits that were about to be cancelled; and failed to pay subcontractors. Sann hoped the lender would remove the loan from default and move forward.

On February 8, 2019, the servicer wrote Clippinger and Sann that they must reach agreement within two weeks to identify a manager; show continued progress in the property's redevelopment; present a construction budget and timeline; and submit an agreement to pay debt service. Without these steps, the lender reserved its right to take action to protect its financial interests, including the appointment of a receiver. Clippinger did not cooperate, and no agreement was reached by the deadline.

Ratel instituted an arbitration proceeding against Clippinger, who counterclaimed denying wrongdoing and asserting that his removal violated the CIP operating agreement. The lender was not involved in the arbitration.

While the arbitration was pending, no new management agreement or guaranty was presented to the lender. Clippinger refused to sign an agreement allowing Sann to act as Project interim manager. Sann offered to buy Clippinger's interest, but they could not agree on a price. Ratel was unable to refinance the loan: No prospective lender wanted exposure to the dispute between Ratel and Clippinger.

ReadyCap did not make a "Mandatory Advance" of funds in May 2019, claiming a default. It believed Ratel did not want the advance at that time because of the ongoing dispute with Clippinger. Ratel's attorney wrote the loan servicer that Ratel was still lining up a contractor. Sann denied ever telling the lender that Ratel did not want the funds.

Borrower did not pay interest directly to the lender because payments were drawn from a reserve account. The reserve account was depleted by June 2019, at which time the lender told Borrower it would have to start making payments. Ratel remitted $112,038 in interest for July 2019. It objected to the lender's extra charges, including legal fees, default interest, title expense, and special servicing fees. When the lender refused to reverse the charges, Borrower and Ratel refused to pay the amounts the lender demanded.

By an assignment signed September 27, 2019, Borrower's note was transferred to respondent RCMF 2018-FL2 Marathon Street, LLC (RCMF).

The arbitration scheduled for October 2019 was dismissed for failure to pay arbitration fees. Ratel chose not to pay Clippinger's delinquent fees because it was unlikely to collect on any award it might get against Clippinger. Meanwhile, Project construction costs had ballooned from $3.2 to $7.8 million. Sann informed investors, "At this new construction cost figure, the investment is not viable."

The Project property was sold in foreclosure in 2020. Ratel did not bid on the property, fearing litigation from Clippinger. The parties dispute whether foreclosure resulted from Borrower's failure to pay money due on the loan, or from the lender's declaration of a default when Ratel removed Clippinger as manager and its refusal to approve a replacement manager. Some individuals stopped investing with Ratel after the Project collapsed.

RCMF filed suit against appellants. Appellants cross-complained against ReadyCap and RCMF. The lenders

demurred. The court sustained the demurrers with leave to amend.

The amended cross-complaint alleges breach of contract. Namely, (1) the lender's declaration of default when Ratel terminated Clippinger; (2) the lender's failure to deposit Mandatory Advance funds to complete the Project due to the declaration of default; and (3) the lender's failure to consent to replacing Clippinger with Ratel as manager. Ratel's claims arise from its status as third party beneficiary of the Loan Agreement.

Respondents moved for summary judgment. They challenged Ratel's standing to sue and argued they did not breach the Loan Agreement by declaring a default, failing to fund the mandatory advance, and or refusing to approve Ratel as manager and guarantor. They are not liable because they did not engage in fraud, gross negligence, or willful misconduct.

In opposition, appellants argued that the Loan Agreement prevents "Borrower" from making a "Transfer." Borrower is CIP, not Ratel. Respondents make no claim that Borrower did anything wrong, or transferred anything; Borrower did not breach the Loan Agreement. Instead, Ratel removed Clippinger as manager. Ratel is allowed to remove Clippinger pursuant to CIP's operating agreement for "Bad Conduct," such as misappropriating funds.

Once Ratel removed Clippinger, it had to replace him with a new manager "acceptable to Lender, in its commercially reasonable discretion." Respondents refused to exercise any discretion to approve a new manager, claimed a breach of the Loan Agreement, and shut down the Project. They never claimed Ratel was not a reasonable replacement for Clippinger.

In reply, respondents argued (1) appellants did not show their loss " 'was solely caused by the fraud, gross negligence, or willful misconduct of Lender,' " as required by the Loan Agreement; (2) appellants lack standing as third party beneficiaries to sue for breach of the Loan Agreement; (3) appellants breached the Loan Agreement by replacing Clippinger as manager without the lender's prior written consent; and (4) it was commercially reasonable for the lender to refuse to accept Ratel as manager and guarantor while the dispute between Ratel and Clippinger was unresolved.

## The Trial Court's Ruling

The court wrote that appellants claim to be third party beneficiaries of the Loan Agreement. As such, they are bound by a clause limiting liability to losses solely caused by lender fraud, gross negligence, or willful misconduct. No evidence shows respondents engaged in prohibited conduct. The court found the limitation on liability clause is not unconscionable: Both parties are sophisticated actors with bargaining parity who "engaged in arms-length negotiations over the terms of the agreement."

The court found appellants are bound by a clause requiring lender approval of a "transfer." Written consent was required for a transfer resulting in the guarantor's loss of legal and managerial control. Clippinger's removal was a transfer, but no lender consent was secured. Respondents' refusal to approve Ratel as manager was "commercially reasonable." The arbitration that would have resolved the dispute between Ratel and Clippinger was dismissed. Respondents feared litigation from Clippinger if they approved his removal as manager and replacement with Ratel. Other lenders declined to finance the Project for the same reason.

9

Respondents did not breach the Loan Agreement by withholding a "Mandatory Advance" in May 2019. No advance was required if an "Event of Default" occurred. An event of default occurred when the loan guarantor, Clippinger, was removed in October 2018. The court found no triable issues of fact, granted the motion for summary judgment, and entered judgment for respondents.[1]

## DISCUSSION

### 1. Appeal and Review

The judgment is appealable. (Code Civ. Proc., §§ 437c, subd. (m)(1), 904.1., subd. (a)(1).) Summary judgment must be granted if no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. (*Id.*, § 437c, subd. (c).) The procedure enables courts to cut through the pleadings and determine if trial is necessary. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.) We independently determine if triable issues exist. (*Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56, 64.)

" '[I]n seeking summary judgment, "a defendant may rely on the complaint's factual allegations, which constitute judicial admissions." ' " (*Food Safety Net Services v. Eco Safe Systems USA, Inc.* (2012) 209 Cal.App.4th 1118, 1126–1127 (*Eco Safe*).) When, as here, the parties' contract is an exhibit to the pleading, it is a binding admission the contract contains all clauses therein, including any limitation on liability. (*Id.* at p. 1127.)

---

[1] The court dismissed RCMF's complaint because it foreclosed on the property securing the debt.

## 2. Rules Relating to Contracts

" ' "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." [Citation.] "Such intent is to be inferred, if possible, solely from the written provisions of the contract." [Citation.] "If contractual language is clear and explicit it governs.' " (*Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 390.)

Appellants plead that they are "intended third-party beneficiaries of the Loan Agreement." "A third-party beneficiary cannot assert greater rights than those of the promisee under the contract. [Citation.] Because the foundation of any right the third person may have is the promisor's contract, '[w]hen [a] plaintiff seeks to secure benefits under a contract as to which he is a third-party beneficiary, he must take the contract as he finds it. . . . [The] third party cannot select the parts favorable to him and reject those unfavorable to him.' " (*Marina Tenants Assn. v. Deauville Marina Development Co.* (1986) 181 Cal.App.3d 122, 132; *Souza v. Westlands Water Dist.* (2006) 135 Cal.App.4th 879, 895.)

## 3. Limitation of Liability Clause

Respondents assert that the breach of contract claim is barred by a clause limiting liability. Section 11.24 of the Loan Agreement reads, "Lender shall not be liable for any loss sustained by Borrower resulting from any act or omission of any Indemnified Party unless it is finally judicially determined that such loss was solely caused by the fraud, gross negligence or willful misconduct of Lender or any Indemnified Party." Indemnified parties include "Lender, each of its Affiliates and their respective successors and assigns, [and] any Person who is or will have been involved with the servicing of the Loan."

11

Respondents relied on section 11.24 in their summary judgment motion, arguing there is no evidence of fraud, gross negligence, or willful misconduct. On appeal, they argue that section 11.24 allows only tort causes of action. Appellants' opening brief does not mention the limitation on liability clause, despite its centrality to the trial court's ruling. Its legal significance and effect present a question of law. (*Canyon Vineyard Estates I, LLC v. DeJoria* (2022) 78 Cal.App.5th 995, 1003.)

Parties may agree to limit liability for breach of contract. (*Artukovich v. Pacific States Cast Iron Pipe Co.* (1947) 78 Cal.App.2d 1, 4; *Markborough California, Inc. v. Superior Court* (1991) 227 Cal.App.3d 705, 714 [clauses limiting liability "have long been recognized as valid in California"].) "With respect to claims for breach of contract, limitation of liability clauses are enforceable unless they are unconscionable, that is, the improper result of unequal bargaining power or contrary to public policy." (*Eco Safe, supra,* 209 Cal.App.4th at p. 1126.) Appellants have abandoned on appeal their claim that the clause is unconscionable.

Though parties may be insulated from liability for ordinary negligence, Civil Code section 1668 (Section 1668) prohibits contracts from exempting persons from their fraud, willful injury to others, or violations of law.[2] (*Werner v. Knoll* (1948) 89 Cal.App.2d 474, 475–476.) "Section 1668 prevents parties 'from

---

[2] Section 1668 reads: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

12

granting themselves licenses to commit future aggravated wrongs.' " (*New England, supra,* 17 Cal.5th at p. 710; *SI 59 LLC v. Variel Warner Ventures, LLC* (2018) 29 Cal.App.5th 146, 152 (*Variel*).)

"Section 1668 reflects the policy of this state to look with disfavor upon those who attempt to contract away their legal liability to others for the commission of torts.  [Citation.]  Under this section, a party may not contract away liability for fraudulent or intentional acts or for negligent violations of statutory law.  On the other hand, ' "a contract exempting from liability for *ordinary* negligence is valid where *no public interest* is involved . . . and no statute expressly prohibits it." ' " (*Blankenheim v. E. F. Hutton & Co.* (1990) 217 Cal.App.3d 1463, 1471–1472 (*Blankenheim*); *Gardner* v. *Downtown Porsche Audi* (1986) 180 Cal.App.3d 713, 716.)

In *Blankenheim*, a brokerage advised plaintiffs to invest in a computer company, and the stock plaintiffs purchased became worthless.  They sued for breach of fiduciary duty and negligent misrepresentation.  (*Blankenheim, supra,* 217 Cal.App.3d at pp. 1466, 1472, fn. 4.)  The brokerage secured summary judgment based on a hold-harmless clause.[3]  The court reversed the ruling on appeal, holding that plaintiffs' claims of misrepresentation fell within the fraud exclusion in Section 1668; the hold-harmless clause was void to the extent it exempted the brokerage from liability for its misrepresentations. (*Id.* at pp. 1472–1473; *Variel,*

---

[3] The provision read:  "In consideration for your willingness to act as my broker in this transaction, I agree to hold you harmless from any loss, expense, claim or responsibility arising out of this transaction." (*Blankenheim, supra*, 217 Cal.App.3d at p. 1470.)

13

*supra,* 29 Cal.App.5th at p. 154 [Section 1668 nullifies a general release of a cause of action for negligent misrepresentation].)

Appellants assert a cause of action for breach of contract. They do not claim misrepresentation or other type of fraud.[4] They allege respondents breached the Loan Agreement by "fail[ing] and refus[ing] to provide the contractually required funds" needed to complete the Project and "erroneously asserted that CIP Jardinette had defaulted on its loan obligations."

Perhaps anticipating respondents' reliance on section 11.24, appellants alleged that the lenders' interpretation of the Loan Agreement was willful misconduct. They alleged it was "willful misconduct to declare that CIP Jardinette defaulted under the Loan Agreement" by removing Clippinger as manager without lender consent. The erroneously declared default was used "to willfully withhold millions of dollars in funding" to complete the Project. Also, the "contract breaches were in bad faith, constituted willful misconduct" and appellants lost millions as a "consequence of [the] multiple breaches and willful misconduct."

"The concept of wilful misconduct has a well-established, well-defined meaning in California law. 'Willful or wanton misconduct is intentional wrongful conduct, done either with a knowledge that serious injury to another will probably result, or with a wanton and reckless disregard of the possible results.' " (*New v. Consolidated Rock Products Co.* (1985) 171 Cal.App.3d 681, 689.) Gross negligence " 'is merely such a lack of care as

---

[4] Appellants argue for the first time in their reply brief that "[r]espondents engaged in fraud." It is too late to add a fraud claim. They are limited to the issues framed by their pleading. (*Eco Safe, supra,* 209 Cal.App.4th at p. 1124.)

14

may be presumed to indicate a passive and indifferent attitude toward results, while wilful misconduct involves a more positive intent actually to harm another or to do an act with a positive, active and absolute disregard of its consequences.' " (*Meek v. Fowler* (1935) 3 Cal.2d 420, 425.)

Appellants offer no evidence respondents were grossly negligent, let alone engaged in intentional misconduct. At most, they disagree with respondents' interpretation of the Loan Agreement, claiming they are mistaken as to what constitutes a "Transfer" requiring lender approval. Appellants cite no authority for the notion that disagreement over the meaning of contract terms is willful misconduct.

A party may limit liability for claims asserting "pure breaches of contract absent a violation of an independent duty that falls within the ambit of section 1668." (*New England, supra,* 17 Cal.5th at p. 717.) "Even where a party breaches for 'nefarious or unethical reasons,' the party is deemed to have 'done nothing more socially opprobrious than to fall short in meeting a contractual commitment.' " (*Ibid.*) In sum, "parties cannot proceed in tort for what are essentially breaches of contract. ' " ' "[A]n omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty." ' " ' " (*Ibid.*) In this instance, appellants have not " ' "demonstrate[d] harm above and beyond a broken contractual promise." ' " (*Ibid.*)

Appellants offered no evidence that their losses were *solely* caused by the lender, as required by section 11.24. The record shows their predicament—and ultimately their loss—was caused by Robert Clippinger. Ratel believed Clippinger misappropriated funds. When confronted, he denied misconduct, objected to Ratel's effort to remove him as manager, refused to consent to a

15

new manager to cure the default, and thwarted refinancing. While the dispute dragged on over Clippinger's "Bad Conduct" under the CIP operating agreement, construction costs soared to the point the Project was not financially viable.

The propriety of Clippinger's removal as manager for bad conduct could have been resolved in an arbitration that was dismissed for failure to pay fees. Had Ratel prevailed in arbitration, it would have eliminated Clippinger's threats of litigation against the lenders if they approved Ratel as manager. Instead, the lenders feared litigation from Clippinger if they authorized his replacement. Clippinger's wrongdoing and dispute with Ratel led to foreclosure; it was not "solely" the fault of the lenders.

California recognizes claims for tortious breach of contract. It arises " 'when (1) the breach is accompanied by a traditional common law tort, such as fraud or conversion; (2) the means used to breach the contract are tortious, involving deceit or undue coercion or; (3) one party intentionally breaches the contract intending or knowing that such a breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages.' [Citation.] Focusing on intentional conduct gives substance to the proposition that a breach of contract is tortious only when some independent duty arising from tort law is violated." (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 553–554.)

Appellants have neither alleged nor proven a tortious breach of the Loan Agreement. They did not show violation of an independent duty arising from tort law. At most, they claim respondents misread the Loan Agreement.

Appellants' brief describes respondents' interpretation of the Loan Agreement as "erroneous." They also describe the trial court's interpretation as "erroneous" because the court adopted respondents' reading. We need not determine whether respondents and the court misinterpreted the Loan Agreement in the same manner.[5] Erroneous or not, respondents' reading of the contract does not rise to the level of "willful misconduct." No showing was made that respondents "caused injury to persons or property that was not reasonably contemplated by the parties when the contract was formed." (*Rattagan v. Uber Technologies, Inc.* (2024) 17 Cal.5th 1, 21.) This was a " 'purely economic loss due to disappointed expectations.' " (*Id.* at p. 20.)

Absent any evidence that fraud, gross negligence, or willful misconduct was the sole cause of appellants' loss, respondents are not liable under Section 11.24 of the Loan Agreement. The court properly granted summary judgment in favor of respondents.[6]

---

[5] Appellants quote the trial court's ruling on demurrer, comparing appellants' interpretation of the Loan Agreement with respondents' competing interpretation, and ruling that appellants' interpretation "is clearly erroneous." The court repeated that conclusion in its summary judgment order.

[6] Because the limitation on liability in section 11.24 is dispositive, we do not reach other issues raised in the briefs.

17

## DISPOSITION

The judgment is affirmed.  Respondents are entitled to recover their costs on appeal.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:


CHAVEZ, J.


RICHARDSON, J.