Filed 4/8/13  Transaction Wireless v. Qualcomm CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| TRANSACTION WIRELESS, INC., | D059955 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2009-00104112-CU-BC-CTL) |
| QUALCOMM INCORPORATED, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Judith F. Hayes, Judge.  Affirmed.

Plaintiff, Transaction Wireless, Inc. (TWI), appeals a summary judgment for defendant Qualcomm Incorporated (Qualcomm) in this action for breach of written contract.  TWI contends we must reverse the judgment because the trial court's order granting the motion violates Code of Civil Procedure[1] section 437c, subdivision (g) by not specifying the particular evidence on which it relied, and the court erred by finding

---

1    Further undesignated statutory citations are also to the Code of Civil Procedure unless otherwise specified.

TWI cannot prove damages measured by lost profits or unjust enrichment. We conclude the contentions lack merit, and thus we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Qualcomm's services include the designing and operation of wireless platforms for businesses. Its "offerings include a . . . managed network service that securely and reliably manages transactions, applications and other data communications between financial companies, wireless operators and mobile handsets."

Comdata Stored Value Solutions, Inc., a subsidiary of Comdata Corporation (Comdata), provides "stored value services such as gift and loyalty cards for retailers." In late 2005 or early 2006, Qualcomm and Comdata began discussing the emerging field of mobile commerce, specifically mobile payroll services.

TWI was founded in October 2006 by Basil Abifaker, for the purpose of "developing a mobile commerce and marketing software platform for the delivery and processing of any wireless stored value transaction, including credit, debit, gift and loyalty cards." Specifically, TWI was developing an "SMS-based" mobile gift card application, called the wGiftCard, designed to deliver gift cards to recipients' phones via text messaging, as an alternative to plastic cards.

TWI, which was unknown to Comdata, wanted to form an alliance with Qualcomm because of its financial resources and to gain access to Comdata's large base of retailer clients. To that end, in November 2006 TWI and Qualcomm entered into a mutual nondisclosure agreement (MNDA). The MNDA provided that each party possessed confidential, proprietary or trade secret "Information" (some capitalization

2

omitted) it wished to disclose to the other party under the terms and conditions of [the MNDA]. The MNDA defined the term "Information" as *not* including information of the disclosing party that "has become generally known to the public without breach of the [MNDA] by the [r]eceiving [p]arty." The MNDA required the receiving party to hold disclosed Information in strict confidence, and to use it for the sole purpose of evaluating the possibility of a joint business relationship.

In early February 2007 TWI demonstrated its wGiftCard to Qualcomm and provided a PowerPoint presentation with text, images, and a description of the product's commercial application. Shortly thereafter, Qualcomm sent Comdata an e-mail pertaining to a mobile payroll service, and advising that Qualcomm had been presented with another mobile commerce possibility, the delivery of gift cards directly to phones. In late February 2007 with TWI's express authorization, Qualcomm introduced TWI's wGiftCard application to Comdata.

Further, TWI, with Qualcomm's knowledge, eventually dealt directly with Comdata. In May 2007 TWI sent Comdata a slide presentation and a press release about the wGiftCard and a document entitled, "White Paper: How to Extend Your Gift Card Revenues and Build New Compelling Consumer Value and Loyalty," which explained how TWI intended its wGiftCard to operate. In June and July, TWI made presentations and demonstrated a working model of its product to Comdata. In July, TWI and Comdata entered into a confidentiality agreement.

Comdata continued to discuss mobile commerce with both Qualcomm and TWI, as well as with other companies. Comdata was trying to find a company "that could

3

come to market with an actual [workable] product" for presentation to Comdata's retailer clients, whether it be a mobile payroll service or mobile gift cards. Comdata found TWI's wGiftCard was "the most complete solution to date," but it had no "workable model."[2] Qualcomm also had no product ready for market, but it was "working on the infrastructure to come up with" a mobile payroll service.

Further, Qualcomm and TWI continued to explore the possibility of a joint venture on mobile gift cards. Comdata encouraged such a venture because TWI could provide technology and Qualcomm could provide TWI with needed infrastructure and financing, which "may push [TWI] over the finish line."

Ultimately, Comdata determined Qualcomm and TWI were the only companies that had the potential to provide it with a marketable product. On August 15, 2007, Comdata and TWI entered into a nonexclusive and nonbinding memorandum of understanding (MOU) "with respect to cooperative efforts related to the development of a wireless gift card service" using TWI's technology. On August 31, 2007, Comdata and Qualcomm entered into a nonexclusive and nonbinding letter of intent concerning Qualcomm's provision of a balance inquiry service via text messaging for holders of plastic gift cards processed by Comdata.

At the time, Comdata remained confident Qualcomm and TWI would form a partnership. In late September 2007, however, Comdata learned Qualcomm and TWI

---

[2]     Abifaker conceded that when TWI was in discussions with Comdata in 2007, its wGiftCard was not yet ready for commercial deployment. TWI did not deploy any feature of its mobile technology until the fall of 2009.

had broken off discussions. At that point, Comdata chose not to proceed with TWI because it was an undercapitalized start-up company that had recently sought venture capital from Comdata, and it was inexperienced in getting a product to market. In contrast, Qualcomm was a large, well capitalized and established company with a lengthy history of bringing products to market.

On October 3, 2007, Qualcomm and Comdata entered into a "Strategic Alliance Agreement" (SAA) under which Qualcomm became Comdata's "preferred provider of mobile commerce applications and solutions." The parties agreed "to collaboratively plan and execute on the development and provision of services to Merchants, whereby Merchants and Users can wirelessly perform certain actions relating to Cards," meaning prepaid plastic gift cards.

The SAA defined three levels of contemplated service. Under the basic service, a registered user would receive a text message with the balance on a plastic gift card; under the deluxe service, a merchant would attach a message related to its product or service; and under the premier service, a registered user would receive an automatic text message when a gift card had not been used for a certain period. The SAA acknowledged that TWI had alleged Qualcomm misappropriated certain proprietary information of TWI, and Qualcomm denied the allegation and was trying to resolve the dispute. Qualcomm was required to indemnify Comdata against any claims by TWI.

In late fall 2007 Qualcomm acquired Firethorn Holdings, LLC (Firethorn). Qualcomm had not yet developed any product for Comdata under the SAA and had received no compensation from Comdata. Firethorn's sole commercial product then was

5

a software application that allowed customers of participating banks to perform functions on their mobile phones, such as checking balances and transferring funds between accounts.

In December 2007 Qualcomm asked Firethorn to explore how it could satisfy Comdata's requirements under the SAA. In May 2008 Firethorn assumed the SAA from Qualcomm, and in June 2009 Firethorn terminated the SAA because it "was never able to convince Comdata to set aside its desire for mobile alerts using SMS text messages and to switch to Firethorn's application-based approach." Firethorn never created a product for Comdata or received any revenue from Comdata.

In August 2010 Firethorn announced a partnership with Discover Financial Services, under which Firethorn would launch a mobile gift card application called SWAGG in time for the 2010 holiday season. According to Qualcomm, SWAGG did not use the same technology as TWI's wGiftCard, text messaging, and instead was "a software, PC Web, and WebKit browser application."

In May 2010 TWI filed its operative first amended complaint (complaint) against Qualcomm for breach of written contract. The complaint alleged that in reliance on the MNDA, TWI disclosed to Qualcomm information about the wGiftCard and, instead of using the information solely to explore the potential of a joint venture, Qualcomm disclosed the information to Comdata for its own use and disrupted TWI's potential relationship directly with Comdata.

In December 2010 Qualcomm moved for summary judgment. Qualcomm argued the information it disclosed to Comdata was not protected Information within the

6

meaning of the MNDA because TWI disclosed the same information to potential investors and to Comdata. Additionally, Qualcomm argued TWI could not prove any legally cognizable damages.

After a hearing, the court overruled all evidentiary objections and granted Qualcomm's motion. The court determined TWI raised triable issues of fact as to whether Qualcomm breached the MNDA, but it was nonetheless entitled to judgment as a matter of law because Qualcomm made a prima facie showing TWI had no resulting damages measured by lost profits or unjust enrichment, and TWI failed to raise a triable issue of material fact on the matter. Judgment was entered for Qualcomm on July 21, 2011.

DISCUSSION

I

*Standard of Review*

Summary judgment may be granted only when a moving party shows it is entitled to a judgment as a matter of law. (§ 437c, subd. (c).) " 'Rulings on such motions are examined de novo.' " (*Benson v. Superior Court* (2010) 185 Cal.App.4th 1179, 1185.)

" 'We review summary judgment appeals by applying the same three-step analysis applied by the trial court: First, we identify the issues raised by the pleadings. Second, we determine whether the movant established entitlement to summary judgment, that is, whether the movant showed the opponent could not prevail on any theory raised by the pleadings. Third, if the movant has met its burden, we consider whether the opposition raised triable issues of fact.' " (*Benson v. Superior Court, supra,* 185 Cal.App.4th at

7

p. 1185.)  We review the evidence in the light most favorable to the plaintiff.  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.)

II

*Sufficiency of the Order*

Preliminarily, we dispose of TWI's contention we should reverse the judgment because the trial court's minute order does not cite the specific evidence on which it relied.  Section 437c, subdivision (g), provides that when granting a motion for summary judgment, the court "shall, by written or oral order, specify the reasons for its determination.  The order shall specifically refer to the evidence proffered in support of, and if applicable in opposition to, the motion which indicates that no triable issue exists."

"The trial court's failure to perform this statutory duty, however, does not automatically require a reversal.  [Citation.]  The de novo standard for appellate review of an order granting summary judgment frequently means the lack of a proper order constitutes harmless error."  (*Main Street Plaza v. Cartwright & Main, LLC* (2011) 194 Cal.App.4th 1044, 1057; *Soto v. State of California* (1997) 56 Cal.App.4th 196, 199.)  If our independent review of the evidence "establishes the validity of the judgment, then the error is harmless."  (*Byars v. SCME Mortgage Bankers, Inc.* (2003) 109 Cal.App.4th 1134, 1146.)

A violation of section 437c, subdivision (g), may constitute reversible error when the trial court's order is insufficient to permit meaningful appellate review.  (*Main Street Plaza v. Cartwright & Main, LLC, supra,* 194 Cal.App.4th at p. 1058 [order insufficient when it gave no explanation of reasons and merely stated summary judgment motion "is

8

granted"]; *Santa Barbara Pistachio Ranch v. Chowchilla Water Dist.* (2001) 88 Cal.App.4th 439, 449 [order insufficient when lack of statement of reasons for ruling precluded de novo review].)  That is not, however, the situation here.

Rather, the trial court's order explains:  "[TWI] has failed to create triable issues of material fact as to the issue of damages.  The fact of damages is speculative and even if the amount of damages could be determined, there is no evidence that [TWI] was actually damaged by Qualcomm's conduct.  Further, there is no evidence that Qualcomm was unjustly enriched by any information it received from [TWI].  [TWI] concedes that neither Qualcomm nor [TWI] reached a binding or enforceable agreement with Comdata to provide wireless delivery of gift cards, and it is undisputed that Qualcomm never provided SMS-based delivery of wireless gift cards for Comdata or anyone else."

The order establishes that in the trial court's view, Qualcomm presented a prima facie case for judgment as a matter of law, based on a lack of damages to TWI; the burden shifted to TWI to raise a triable issue of fact as to damages; and TWI did not meet its burden.  The order allows us to conduct a de novo review, and thus its lack of specific citations to the evidence is harmless.

III

*Lost Profits*

A

TWI's theory is that Qualcomm breached the MNDA by disclosing confidential information to Comdata not solely for the purpose of exploring a joint venture between Qualcomm and TWI, but rather to give Qualcomm an edge with Comdata and interfere

9

with TWI's ability to contract directly with Comdata.[3]  TWI contends Qualcomm failed to meet its initial burden of establishing entitlement to judgment as a matter of law on TWI's claim for lost profits, and thus the burden did not shift to TWI to raise a triable issue of material fact.  We conclude the contention lacks merit.

"Damages awarded to an injured party for breach of contract 'seek to approximate the agreed-upon performance.'  [Citation.]  The goal is to put the plaintiff 'in as good a position as he or she would have occupied' if the defendant had not breached the contract."  (*Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist.* (2004) 34 Cal.4th 960, 967.)

"No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin."  (Civ. Code, § 3301.)  "Generally, 'damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery.'  [Citation.]  Thus, '[l]ost anticipated profits cannot be recovered if it is uncertain whether any profit would have been derived at all from the proposed undertaking.  But lost prospective net profits may be recovered if the evidence shows, with reasonable certainty, both their occurrence and extent.  [Citation.]'

_____

[3]    TWI's complaint, however, did not include a cause of action against Qualcomm for intentional interference with prospective business advantage.  "The elements of this tort are:  '1) an economic relationship between the plaintiff and some third person containing the probability of future economic benefit to the plaintiff; 2) knowledge by the defendant of the existence of the relationship; 3) intentional acts on the part of defendant designed to disrupt the relationship; 4) actual disruption of the relationship; and 5) damages proximately caused by the acts of the defendant.' "  (*Amid v. Hawthorne Community Medical Group, Inc.* (1989) 212 Cal.App.3d 1383, 1392.)

[Citation.]  Under these principles, *lost profits based on a future contract cannot be recovered when the contract is uncertain or speculative*."  (*Food Safety Net Services v. Eco Safe Systems USA, Inc.* (2012) 209 Cal.App.4th 1118, 1132, italics added; *Copeland v. Baskin Robbins U.S.A.* (2002) 96 Cal.App.4th 1251, 1263 ["Satisfactory proof of [lost profits] is impossible [when] there is no way to know what the eventual terms of the . . . agreement would have been, or even if the parties would have reached an agreement."]; *Citri-Lite Co. v. Cott Beverages, Inc.* (E.D.Cal. 2010) 721 F.Supp.2d 912, 937-938 [plaintiff could not recover lost profits based on renewal of the contract when there was no evidence the contract would be renewed].)

To show TWI had no prospect of winning a contract with Comdata, Qualcomm submitted evidence TWI had only a nonexclusive and nonbinding MOU with Comdata, which contemplated no contract terms.  Further, Qualcomm relied on deposition testimony of its executive Robert H. Skiba, who had contracting authority.  He ultimately declined to have Comdata contract directly with TWI because it was a start-up company, it was seeking venture capital from Comdata, and it was "possibly going to . . . run dry of funding."  Further, TWI had "what appeared to be emerging technology, but no real product out in the marketplace that was being used by anybody else."  Skiba chose to proceed with Qualcomm for mobile commerce because it was well capitalized, it was a "very large company with a long history of established products, goods, services, and infrastructure," and its products "were being used by firms all over the country."  The evidence belies the notion TWI had a prospective contract with Comdata.

11

Moreover, even when there is a prospective contract, to obtain lost profit damages a "plaintiff must show loss of *net pecuniary gain*, not just loss of revenue." (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 884 (*Kids' Universe*), italics added.) "The Court of Appeal has defined lost profits as follows: ' "Net profits are the gains made from sales 'after deducting the value of the labor, materials, rents, and all expenses, together with the interest of the capital employed.' " ' " (*Ibid.*)

"When the operation of an unestablished business is prevented, . . . prospective profits may be shown in various ways." (*Kids' Universe, supra,* 95 Cal.App.4th at p. 884.) " '[D]amages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analysis, [and] business records of similar enterprises.' " (*Ibid.*) When the defendant " 'has prevented the beginning of a new business . . . all factors relevant to the likelihood of the success or lack of success of the business . . . that are reasonably provable are to be considered, including general business conditions and the degree of success of similar enterprises.' " (*Ibid.*; *Resort Video, Ltd. v. Laser Video, Inc.* (1995) 35 Cal.App.4th 1679, 1698 ["Unestablished businesses have been permitted to claim lost profit damages in situations where owners have experience in the business they are seeking to establish, and where the business is in an established market."].)[4]

---

[4] For instance, in *S. Jon Kreedman & Co. v. Meyers Bros. Parking-Western Corp.* (1976) 58 Cal.App.3d 173, 184-185, the appellate court held the evidence supported a lost profits claim when a developer did not construct a parking garage as agreed. Even though the parking garage was a new venture, the parking business in general had an established market; the plaintiff was a highly experienced garage operator; the operation

12

Qualcomm's evidence defeats a claim of lost net gain to TWI. At the relevant time both TWI, founded in 2006, and the mobile gift card industry were unestablished. Further, TWI had raised more than $4 million in venture capital since 2008, but it had generated less than $37,000 in gross revenue through the end of September 2010 and it had never made a profit.

TWI cursorily asserts Qualcomm's evidence is insufficient because it "avoid[s] the obvious question of whether Qualcomm's breach [of the MNDA] was the *cause* of the lack of profit." TWI's theory, however, would essentially negate the rule against speculative damages. To the contrary, the rule applies when an alleged breach of contract results in the loss of a new business opportunity, as discussed. Standing alone, Qualcomm's alleged breach does not suggest TWI lost prospective profits.

Qualcomm met its burden of producing evidence establishing the speculative nature of both a prospective contract between TWI and Comdata, the terms of any such contract, and any net gain to TWI from such a contract. Thus, the burden of production shifted to TWI on the issue of lost profits.

B

TWI contends it did meet its burden. TWI asserts the deposition testimony of Skiba that Qualcomm submitted inaccurately reflects his position, and he actually viewed TWI as qualified to become Comdata's partner.

---

of a parking garage is a relatively simple operation; and expert testimony concluded based on feasibility studies that had the parking garage been constructed it would have been profitable.

13

TWI cites Skiba's testimony that Comdata was "looking for the best possible solution with somebody that could come to market with an actual product," and he had advised TWI that it "offered the most complete solution to date," because the solution used technology most retailers already had and thus it could overcome retailer resistance. Further, as of August 1, 2007, Skiba considered TWI "the only company that we were talking to that actually was ready . . . to test" technology on "balance inquiry" for plastic credit cards.

Additionally, on September 14, 2007, Skiba provided a positive recommendation to a potential investor in TWI. When asked how he envisioned a "go to market strategy" with TWI, Skiba responded: "Right now I have about 650 customers in the turnkey outsourced gift card market like Costco, Gap, JC Penney. What I liked about the [TWI] product is that it will allow me to start out with baby steps, and get a sense of the markets [*sic*] acceptance of the text solution. Right now there is a 1-800 number on the back of my cards where you can call and get your balance on the back of the card, and the Y and X generation is using that with significant frequency and getting the balance of their card. We are going to use the [TWI] solution to serve as the text ability, where the teenagers will be ability [*sic*] to text in and get their balance shoot [*sic*] back to you."

This evidence does not, however, affect Skiba's unequivocal testimony that when he *later* learned Qualcomm and TWI were no longer discussing a joint venture, he declined to have Comdata contract directly with TWI because it was an undercapitalized start-up company with no experience in bringing a new product to market. Skiba considered Abifaker to be "one of the most savvy, technical guys I've ever seen," but he

14

clarified that while Abifaker was "talking to me about delivering a product," he was still looking for venture capital for TWI. TWI presented no evidence, through Skiba or otherwise, that Qualcomm's alleged breach of the MNDA, by divulging the wGiftCard concept to Comdata without the intent to pursue a joint venture with TWI, caused Comdata's ultimate reluctance to take a chance on mobile commerce directly with TWI.

In any event, even assuming there were a triable issue of fact on TWI's potential of contracting with Comdata, TWI did not raise any triable issue of fact pertaining to its loss of prospective *profits*. TWI presented no expert testimony, no evidence it had previous experience in the business it sought to establish, no evidence there was any established market for its technology, no evidence of general business conditions or its own capitalization and economic state, and no evidence of the cost of performing under any contract with Comdata.

TWI claims Qualcomm's own projections satisfy the damages element. TWI cites a February 7, 2007, internal Qualcomm e-mail from David Wood to Stu Heilsberg, with the subject line "Planning Thoughts for [TWI]." The memorandum states, "I wanted to be sure we are now all on the same page regarding Basil [Abifaker]. Per our conversation yesterday, you have overall point for this account. I have attached above the beginnings of a presentation on them that includes my thoughts on business model." The attachment included a page entitled "The Market Opportunity," which estimated annual Qualcomm revenue of between $17 and $30 million from a gift card deal with Comdata, based on the assumption that 10 percent of Comdata's plastic gift card business may switch to the mobile market. The attachment included another page entitled

15

" 'Possible' Business Model," which included a revenue sharing arrangement among Qualcomm, Comdata and TWI.

"Although prelitigation projections are relevant and admissible, especially when they are prepared by the defendant [citations], the projections must nevertheless be based on *facts* that are substantially similar to the lost business opportunity." (*Parlour Enterprises, Inc. v. Kirin Group, Inc.* (2007) 152 Cal.App.4th 281, 290.) TWI claims Qualcomm's "projections made conservative assumptions [and] were based on a detailed analysis of the market." The portions of the appellate record TWI cites, however, do not support these claims. The market for mobile gift cards was unknown, and thus Qualcomm's estimate of the percentage of Comdata's plastic gift card market that would switch to mobile gift cards was speculative. Further, Qualcomm is an established business with existing infrastructure, and TWI presented no evidence the estimate would apply to a start-up company. As Qualcomm observes, "TWI cites no case in which unrealized projections of future revenues from undeveloped markets were used to establish damages flowing from a hypothetical contract with a non-party to the lawsuit."

Moreover, the issue is whether TWI would be *profitable*, not the amount of Qualcomm's estimated revenue. TWI "presented no evidence to the effect it was reasonably probable the venture would have been profitable, i.e., gains . . . would have exceeded the costs of opera[tion]." (*Kids' Universe*, *supra*, 95 Cal.App.4th at p. 888.) It is undisputed that despite infusions of $4 million in capital since 2008, as of 2010 Comdata had earned only $37,000 in gross revenue and had not realized any profit. Under these circumstances, the "evidence would not allow a reasonable trier of fact to

16

find with reasonable certainty lost net *profits*" from the alleged inability to contract with Comdata. (*Id.* at p. 887.) TWI is mistaken in asserting its damages "can be measured by the amount of *revenue* which TWI lost . . . as a result of its breach of the MNDA." (Italics added.) We agree with the trial court's finding that TWI raised no triable issue of fact on lost profits. Presented with the evidence, a jury could not award TWI damages without engaging in conjecture and speculation.[5]

IV

*Unjust Enrichment*

Alternatively, TWI contends Qualcomm did not meet its initial burden of negating damages measured by unjust enrichment, and thus the burden did not shift to TWI to raise a triable issue of material fact. We also disagree with this contention.

The unjust enrichment doctrine "applies where the plaintiffs, while having no enforceable contract, nonetheless have conferred a benefit on the defendant which the defendant has knowingly accepted under circumstances that make it inequitable for the defendant to retain the benefit without paying for its value. [Citation.] The defendant in an unjust enrichment claim must pay the amounts necessary to place the plaintiff in as good a position as he or she would have been had no contract been made. [Citation.] . . . '[T]he measure of damages . . . for unjust enrichment "is synonymous with

_____

5      This analysis applies equally to Qualcomm's projected revenue from mobile commerce in relation to its purchase of Firethorn, as the evidence does not pertain to TWI's projected profitability from its wGiftCard technology. Qualcomm was an established business and TWI was an unestablished business, and there is no suggestion they would have had similar financial, developmental, and operational costs.

17

restitution." ' [Citation.] ' " 'In modern legal usage, its meaning has frequently been extended to include not only the restoration or giving back of something to its rightful owner, but also compensation, reimbursement, indemnification, or reparation for benefits derived from, or for loss or injury cause[d] to, another.' " ' " (*Hernandez v. Lopez* (2009) 180 Cal.App.4th 932, 938-939; *Ajaxo Inc. v. E\*Trade Group Inc.* (2005) 135 Cal.App.4th 21, 56.)

In opposing summary judgment, Qualcomm argued TWI could not seek unjust enrichment because its complaint did not pray for equitable relief. There is, however, " ' "no particular form of pleading necessary to invoke the doctrine" of restitution.' " (*Dunkin v. Boskey* (2000) 82 Cal.App.4th 171, 198, fn. 15.) Unjust enrichment damages are available in a breach of contract action when the complaint "fully raised *all the facts and circumstances* in which equity could contemplate a quasi-contractual remedy." (*Hernandez v. Lopez*, *supra*, 180 Cal.App.4th at p. 939, italics added.)

The *evidence* Qualcomm submitted, however, showed as a matter of law that TWI was not entitled to unjust enrichment under the facts and circumstances the complaint raised. Qualcomm's separate statement listed as undisputed facts that neither it nor Firethorn developed a product for Comdata or received any payment from Comdata. Qualcomm cited the deposition testimony of Thomas Niedbalski, Jr., who at the relevant time was with Comdata, and the declaration of Ben Ackerman, who was an executive with Firethorn.

Moreover, the trial court addressed unjust enrichment in its ruling. It determined "there is no evidence that Qualcomm was unjustly enriched by any information it

18

received from [TWI]. [TWI] concedes that neither Qualcomm nor [TWI] reached a binding or enforceable agreement with Comdata to provide wireless delivery of gift cards, and it is undisputed that Qualcomm never provided SMS-based delivery of wireless gift cards for Comdata or anyone else."[6] We agree with this ruling.

TWI now asserts that while "Qualcomm argued it made no money on the Comdata relationship . . . that myopic focus on one business relationship was insufficient to meet its initial burden. Qualcomm did not address its misappropriation of TWI's gift card invention . . . or deny, much less disprove, that TWI's intellectual property benefitted Qualcomm's development and *introduction of SWAGG*. The economic outcome of the Comdata contract for Qualcomm did not eliminate all of the benefit which Qualcomm received from its breach." (Italics added.)

We disagree that Qualcomm's moving burden included the production of evidence showing it was not unjustly enriched by the supposed implementation of TWI's

---

6    TWI suggests the trial court erred by considering Qualcomm's evidence on the lack of any profit on the Comdata deal for purposes of unjust enrichment, because its memorandum of points and authorities referred to the evidence in a section concerning TWI's lost profit claim, instead of in a separate section devoted to unjust enrichment. A court, however, has discretion to disregard any shortcoming in a memorandum of points and authorities. (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2012) ¶ 10:103, p. 10-43; *Taliaferro v. Coakley* (1960) 186 Cal.App.2d 258, 262.) The evidence was outlined in Qualcomm's separate statement and it clearly goes to the unjust enrichment issue. The separate statement "serves two functions: to give the opponent notice of the facts; and to permit the trial court to focus on the facts germane to the issues." (*North Coast Business Park v. Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 30.) Likewise, we find no merit to TWI's complaint the trial court's ruling was based on Qualcomm's reply papers rather than on evidence submitted with its moving papers.

19

technology in SWAGG. "In ruling on a summary judgment motion, the issues which are material are limited to the allegations of the complaint." (*Lewinter v. Genmar Industries, Inc.* (1994) 26 Cal.App.4th 1214, 1223; *Davis v. Foster Wheeler Energy Corp.* (2012) 205 Cal.App.4th 731, 736 [a defendant is required "only to address the allegations and theories in the complaint"].) TWI's complaint alleged TWI advised Qualcomm it had a prospective business relationship with Comdata, and Qualcomm breached the MNDA by using TWI's confidential information "for the prohibited purpose of competing with [TWI]." The complaint does not mention SWAGG or allege any facts suggesting Qualcomm was unjustly enriched other than by wrongfully competing for Comdata's business, and thus TWI cannot reasonably criticize Qualcomm for not addressing SWAGG in its separate statement. While pleadings "must be liberally construed, with a view to substantial justice between the parties" (§ 452), a defendant's burden on summary judgment is not based on guesswork.[7]

Qualcomm reasonably relied on the complaint allegations in disproving unjust enrichment pertaining to Comdata. Qualcomm's evidence showed entitlement to judgment as a matter of law, and thus the burden of production shifted to TWI to raise a material issue of fact. If TWI sought unjust enrichment damages based on SWAGG, it was incumbent on TWI to raise triable issues of fact on that theory. TWI contends only

---

[7] TWI asserts that even if its complaint inadequately alleged unjust enrichment, its response to Qualcomm's demand for a bill of particulars was sufficient. The response, however, merely states, "damages may be measured by the benefit to [Qualcomm] from its breaches of the [MNDA]." It does not indicate any type of unjust enrichment pertaining to SWAGG.

20

that Qualcomm failed to meet its initial burden; it does not contend it raised a triable issue of material fact pertaining to any unjust enrichment of Qualcomm through either Comdata or SWAGG.  Thus, the trial court's ruling was proper.[8]

DISPOSITION

The judgment is affirmed.  Qualcomm is entitled to costs on appeal.

McCONNELL, P. J.

WE CONCUR:

O'ROURKE, J.

IRION, J.

---

[8] Given our holding, we are not required to consider Qualcomm's contention it was entitled to summary judgment on the additional ground that it did not breach the MNDA.

21