Filed 1/31/24 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| EPOCHAL ENTERPRISES, INC., | D079905 |
|   Plaintiff, Cross-defendant and Appellant, | |
|     v. | (Super. Ct. No. 37-2018-00027797-CU-CO-NC) |
| LF ENCINITAS PROPERTIES, LLC, et al., | ORDER MODIFYING OPINION AND DENYING REHEARING |
|   Defendants, Cross-complainants and Appellants. | NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on January 12, 2024, be modified as follows:

1. On page 2, the third sentence is modified to read as follows:

"After plaintiff sued defendants, a jury found defendants liable for premises liability and negligence."

There is no change in the judgment.

The petition for rehearing is denied.

HUFFMAN, Acting P. J.

Copies to:  All parties

2

Filed 1/12/24; Certified for Publication 1/25/24 (order attached) (unmodified opn.)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| EPOCHAL ENTERPRISES, INC., <br><br>    Plaintiff, Cross-defendant and Appellant, <br><br>      v. <br><br>LF ENCINITAS PROPERTIES, LLC, et al., <br><br>    Defendants, Cross-complainants and Appellants. | D079905 <br><br><br> (Super. Ct. No. 37-2018-00027797-CU-CO-NC) |

APPEALS from a judgment of the Superior Court of San Diego County, Blaine K. Bowman, Judge. Affirmed in part, reversed in part, and remanded for further proceedings.

G10 Law and Daniel T. Watts for Plaintiff, Cross-defendant, and Appellant Epochal Enterprises, Inc.

Procopio, Cory, Hargreaves & Savitch, Kendra J. Hall; Solomon Ward Seidenwurm & Smith, William V. Whelan and Matthew T. Arvizu for Defendants, Cross-complainants, and Appellants LF Encinitas Properties, LLC and Leichtag Foundation.

Epochal Enterprises, dba Divine Orchids (plaintiff) entered into a commercial lease agreement with landlord LF Encinitas Properties, LLC and Leichtag Foundation (defendants).  The lease contained a limitation of liability clause stating, in relevant part, defendants are not personally liable as to any provision of the lease or the premises and plaintiff waived all claims for "consequential damages or loss of business or profits."  After plaintiff sued defendants, a jury found defendants liable for premises liability, negligence and concealment.  The jury awarded plaintiff damages for lost profits and other past economic loss.  The trial court granted defendants' motion for judgment notwithstanding the verdict (JNOV), finding the lease agreement's limitation of liability clause prevented plaintiff from recovering the economic damages the jury awarded.  This appeal follows.

Plaintiff appeals from the order granting JNOV in defendants' favor. Should we agree with plaintiff and reinstate the jury's verdict, defendants filed a protective cross-appeal challenging a portion of the damages award as not supported by the evidence.

As we shall explain, we agree the trial court erred in granting JNOV in defendants' favor and we reverse the order.  On defendants' cross-appeal, we conclude substantial evidence supports the damages award and affirm the denial of defendants' motion for partial JNOV.[1]

---

[1]     In addition to its request for JNOV, defendants brought an alternative motion for new trial.  The trial court denied the motion as moot.  On remand, defendants may request that the trial court rule on this motion.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Facts Leading to the Lease Agreement*

In 2012, defendants purchased real property containing dilapidated commercial greenhouses "as is," knowing the greenhouses contained asbestos and lead paint. The greenhouses were built in the 1960's and defendants planned to modernize them. The property contains multiple structures, each one of which is called a "range." Some of the ranges are greenhouses. Defendants were informed about asbestos and lead in the greenhouses, that Range 15 had friable asbestos coming from the joints of the heating system, and inert asbestos existed in certain portions of the mechanics of the other greenhouses.

During the escrow process, defendants cleared Range 15 of friable asbestos. Other ranges held inert asbestos that to defendants' knowledge did not pose a threat to people or property. Defendants hired a firm to conduct an environmental investigation, which recommended that defendants adopt an operation and management plan with respect to asbestos on the property. Defendants planned to remediate ranges as they became empty but they failed to do that when Range 9 became vacant.

Plaintiff is owned and operated by Victor Le and his wife Ying Lee (the principals). In 2015, plaintiff earned approximately $478,000 in gross sales. Plaintiff owns two greenhouses in Fallbrook totaling 30,000 square feet, and an 8,000 square foot greenhouse in Encinitas that is on the same property as the principals' residence.

Defendants' employee Dempsey Sawyer showed Range 9 to the principals. Sawyer knew Range 9 potentially contained asbestos and lead-based paint but did not believe that any asbestos had been released. Sawyer never discussed lead or asbestos contamination with the principals. He

3

believed he did not need to disclose the existence of asbestos to plaintiff because the general language in the lease regarding hazardous materials eliminated the need to inform plaintiff specifically about asbestos or lead. Sawyer knew that exposing inert asbestos to the elements could make it friable but did not inform plaintiff about this concern because he knew plaintiff would be rebuilding the greenhouse and the asbestos would then not be exposed to the elements. Mr. Le had never heard of asbestos and plaintiff never received written information from defendants about asbestos or lead paint before entering the lease.

B. *The Lease Agreement*

In 2014, Mr. Le, on behalf of plaintiff, signed an agreement with defendants to lease Range 9 from defendants "as-is" for five years at eight cents a square foot.[2] Defendants' law firm drafted the lease. Plaintiff did not have a lawyer or anyone else review it. Mr. Le did not read the lease except for the lease price and term, and Mrs. Lee did not read the lease at all.

The lease contained an indemnification provision shielding defendants from personal injury or property damage liability for property connected with plaintiff's use of the premises, absent gross negligence or intentional misconduct by defendants:

---

[2]     The "as-is" provision provides: "Delivery of Premises. Except as expressly set forth in this Section 6.1, Landlord is delivering and Tenant accepts the Premises "AS-IS", "WHERE IS" and "WITH ALL FAULTS" without any representations, warranties, or guaranties of any nature, express or implied, oral or written, past, present or future regarding the Premises or the Restroom Facilities. Landlord shall complete the following work within a commercially reasonable time following the full execution and delivery of this Lease. . .: installation of a submeter for gas and electrical service to the Premises. Any other additions, alterations or improvements desired by Tenant shall be at Tenant's sole cost and expenses. . . ."

"10.1 <u>Indemnification</u>: *This Lease is made upon the express condition that Landlord shall be free from all liability and claims for damages by reason of any injury to any person or persons, including the agents and employees of Tenant, or property of any kind whatsoever and to whomsoever belonging, including Tenant's property, from any cause or causes whatsoever, in, upon or in any way connected with the Premises or its use or occupancy during the Term, excepting only liability caused by the gross negligence or intentional misconduct of Landlord.* Tenant shall indemnify and hold Landlord harmless from all such liability, loss, cost, expense, and obligations, including reasonable attorneys' fees, on account or arising out of any cause in, on or about the Premises during the Term and/or any acts, omissions or negligence of Tenant or of any person claiming by, through or under Tenant, or of the contractors, agents, employees, licensees or invitees of tenant or any such person in, on or about the Project, however occurring except as may be caused by the gross negligence or intentional misconduct of Landlord." (Italics added.)

Plaintiff also agreed to a provision limiting defendants' liability:

"10.6 <u>Limitation of Liability</u>: *Neither Landlord nor any affiliate of Landlord nor their respective members, principals, beneficiaries, partners, trustees, shareholders, directors, officers, employees, contractors or agents shall have any personal liability with respect to any of the provisions of the Lease or the Premises.* If Landlord is in breach or default with respect to Landlord's obligations under the Lease, Tenant shall look solely to the equity interest of Landlord in the Project for the satisfaction of Tenant's remedies or judgments. No other real, personal, or mixed property of any Landlord, wherever situated, shall be subject to levy to satisfy such judgment. Upon any transfer of Landlord's interest in this Lease or in the Project, the transferring Landlord shall have no liability or obligation for matters arising under this Lease from and after the date of such Transfer. *Landlord shall in no event be liable for any consequential damages or loss of business*

> *or profits and Tenant hereby waives any and all claims for any such damages.*"  (Italics added.)

After plaintiff moved into Range 9, Mr. Le started renovating the property.  Sawyer knew plaintiff planned renovation of Range 9 would expose asbestos to the elements and this "concern[ed]" him.  He does not recall ever expressing this concern to Mr. Le.

### C.  *The Storm and Unlawful Detainer Action*

In March or April 2016, a storm damaged Range 9.  After the storm, Mr. Le saw a steam pipe spraying inside the greenhouse and informed defendants.  He was told to leave the door open so defendants could send people to clean the room.  The lease agreement stated plaintiff was responsible for any repairs to the property.  Nonetheless, Sawyer had a company that did asbestos remediation do the repair because the corner of the valve had asbestos and he was concerned this might be a problem.  The company defendants hired to make the repair never tested for asbestos but treated the repair as "an asbestos job."  Sawyer never informed plaintiff about his concern that asbestos might have been released because the pipe was in an area of the leased premises open to the air.  Defendants believed they had no affirmative obligation to notify plaintiff of the release or potential release of asbestos and claimed the company it hired to do the remediation work could determine whether to advise plaintiff.

Plaintiff fell behind in rent payments, and in May 2016, defendants sent a notice to quit or pay rent.  In December 2016, defendants filed an unlawful detainer action against plaintiff.

In the meantime, after the repairs on the pipe, Mr. Le noticed some debris remained.  Becoming concerned that the debris might contain asbestos, he sent samples to a laboratory for testing.  Lab reports dated February and March 2017, revealed asbestos and lead paint on the insulation

6

pipes running through Range 9. In March 2017, the County of San Diego quarantined Range 9 based on friable asbestos in the air and on the ground. Friable asbestos is more of a health risk because it could be released further.

In April 2017, defendants obtained a default judgment in the unlawful detainer action. That same month, as part of the abatement plan, defendants had the orchid plants and soils HEPA vacuumed. After the vacuuming, samples of the soil showed no asbestos. In May 2017, defendants notified plaintiff to retrieve its orchids, but plaintiff did not do so and abandoned its inventory.

D. *Plaintiff's Lawsuit*

In June 2018, plaintiff filed this action based on defendants' failure to disclose asbestos and lead paint in Range 9. It sought economic damages for its orchid inventory. The complaint alleged seven causes of action: (1) premises liability; (2) negligence; (3) intentional misrepresentation; (4) breach of contract rescission based on fraud; (5) unjust enrichment; (6) breach of implied covenant of good faith and fair dealing; and (7) unfair business practices. Defendants filed a cross-complaint against plaintiff for breach of lease. The jury's special verdict found defendants liable for premises liability and negligence. The jury also found defendants intentionally failed to disclose facts plaintiff did not know, and could not reasonably have discovered but the jury found no intent to deceive and therefore no liability for concealment. The jury awarded plaintiff $144,300 in "lost profits" and $77,700 in "other past economic loss." On defendants' counterclaim the jury found plaintiff failed to pay the rent under the lease but that the failure did not harm defendants. The court entered judgment for plaintiff on its complaint.

7

E. *Posttrial Proceedings*

Defendants filed a motion for JNOV challenging the economic damage award to plaintiff based on plaintiff's contractual waiver of consequential damages and the jury's finding that defendants were only liable for negligence. Defendants also filed a partial request for JNOV regarding the jury's award of $77,700 for "other past economic loss" claiming plaintiff submitted no damage evidence except for "lost profits," and there is no evidentiary support in the record supporting an award for "other past economic loss." The trial court granted defendants' motion for JNOV. The court concluded that the limitation of liability clause (lease section 10.6) barred plaintiff's recovery. Although the trial court also addressed the arguments regarding the indemnity provision (lease section 10.1) it stated, "the 'indemnification' clause is separate from the 'limitation of liability' clause. . . . [T]he 'limitation of liability' clause applies to the damages at issue here (which are economic in nature) and thus it is not clear why the 'limitation of liability' clause would stop applying just because the 'indemnification' clause does not."

## I. GENERAL LEGAL PRINCIPLES

" 'The trial court's discretion in granting a motion for [JNOV] is severely limited.' [Citation.] ' "The trial judge's power to grant a [JNOV] is identical to his power to grant a directed verdict [citations]. The trial judge cannot reweigh the evidence [citation], or judge the credibility of witnesses. [Citation.] If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for [JNOV] should be denied. [Citations.] 'A motion for [JNOV] of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there

8

is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied.' [Citation.]" ' [Citation]" (*Hansen v. Sunnyside Products, Inc.* (1997) 55 Cal.App.4th 1497, 1510.) "On review of an order granting JNOV, we ' "must resolve any conflict in the evidence and draw all reasonable inferences therefrom in favor of the jury's verdict." ' " (*Ibid.*) We also "determine de novo whether there is substantial evidence to support the verdict and whether the moving party is entitled to judgment in its favor as a matter of law." (*Paykar Constr. v. Spilat Constr. Corp.* (2001) 92 Cal.App.4th 488, 494.)

A "special verdict must present the conclusions of fact as established by the evidence, and not the evidence to prove them; and those conclusions of fact must be so presented as that nothing shall remain to the Court but to draw from them conclusions of law." (Code Civ. Proc., § 624.) "The elements of a cause of action constitute the essential or ultimate facts in a civil case . . . ." (*Stoner v. Williams* (1996) 46 Cal.App.4th 986, 1002.) To the extent there is an ambiguity in the special verdict after the jury is discharged, the trial court's function is to interpret the verdict " 'from its language considered in connection with the pleadings, evidence and instructions.' " (*Woodcock v. Fontana Scaffolding & Equip. Co.* (1968) 69 Cal.2d 452, 456 (*Woodcock*).) If trial court's interpretation is incorrect, we will interpret the verdict if it is possible to give a correct interpretation. (*Id.* at p. 457.) Because a " 'special verdict's correctness must be analyzed as a matter of law' " (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 678), on appeal we review de novo the trial court's interpretation of the special verdict (*Fuller v. Department of Transportation* (2019) 38 Cal.App.5th 1034, 1038).

## II. PLAINTIFF'S APPEAL

### A. *The Indemnification Clause Does Not Bar Plaintiff's Damages*

Section 10.1 of the lease is an indemnification clause which provides defendants are "free from all liability and claims for damages" except for liability caused by defendants' "gross negligence or intentional misconduct" and that plaintiff "shall indemnify and hold [defendants] harmless" from liability unless the liability is based on defendants' "gross negligence or intentional misconduct." Plaintiff's first cause of action for premises liability/negligence alleged defendants breached their duty to warn plaintiff of any contamination hazards or warn plaintiff about the risks of exposure to asbestos. The second cause of action for negligence alleged defendants breached their duty to plaintiff by leasing the property without informing plaintiff of the risk and failed to comply with all state laws.

Anticipating defendants would rely on the indemnification clause (section 10.1) to avoid liability except for "liability caused by [defendants'] gross negligence or intentional misconduct," plaintiff alleged that defendants' conduct constituted gross negligence. Accordingly, the court instructed the jury that defendants are "not responsible for [plaintiff's] harm, unless you find that [defendants were] grossly negligent, committed fraud, or intentionally harmed [plaintiff]." Based on this instruction, plaintiff contends that by awarding damages the jury necessarily found defendants grossly negligent.

Defendants argue plaintiff failed to obtain specific jury findings on whether defendants committed gross negligence so as to take their conduct outside the scope of the indemnification clause and this court cannot imply findings from the jury's special verdicts. We disagree that plaintiff was

required to present to the jury a special verdict form asking whether defendants committed gross negligence.

Gross negligence is defined as "either a ' " 'want of even scant care' " ' or ' " 'an extreme departure from the ordinary standard of conduct.' " ' " (*City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 754.) Gross negligence "connotes such a lack of care as may be presumed to indicate a passive and indifferent attitude toward results." (*Calvillo–Silva v. Home Grocery* (1998) 19 Cal.4th 714, 729, disapproved of on other grounds by *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853, fn. 19.) "California does not recognize a distinct common law cause of action for gross negligence apart from negligence." (*Jimenez v. 24 Hour Fitness USA, Inc.* (2015) 237 Cal.App.4th 546, 552, fn.3; *City of Santa Barbara*, at pp. 779–780 ["We do not view our holding . . . as recognizing a cause of action for gross negligence."].) Gross negligence is different from ordinary negligence in degree, not in kind. (*Anderson v. Fitness Internat., LLC* (2016) 4 Cal.App.5th 867, 881.) Because gross negligence is simply a degree of negligence, the elements of a claim for gross negligence is the same as one for ordinary negligence. (*Rosencrans v. Dover Images, Ltd.* (2011) 192 Cal.App.4th 1072, 1082.)

"Where liability attaches only for gross negligence it is for the jury, under proper instructions by the court, to pass upon the question whether such negligence exists." (*Krause v. Rarity* (1930) 210 Cal. 644, 655.) Here, the trial court defined gross negligence (CACI No. 425) and instructed the jury, consistent with the indemnification clause, that plaintiff could not recover damages unless it found defendants were "grossly negligent, committed fraud, or intentionally harmed [plaintiff]." (CACI No. 451.) As relevant here, the jury received special verdict forms on plaintiff's causes of

11

action for premises liability, negligence, and negligence (vicarious liability). It found in plaintiff's favor on all three causes of action, concluded defendants intentionally failed to disclose facts plaintiff did not know and could not reasonably have discovered, and awarded plaintiff damages.

We presume the jury followed the trial court's instruction that plaintiff could not recover damages unless it found defendants were "grossly negligent, committed fraud, or intentionally harmed [plaintiff]." (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803–804 (*Cassim*) ["[a]bsent some contrary indication in the record, we presume the jury follows its instructions [citations] 'and that its verdict reflects the legal limitations those instructions imposed' "]; see *People v. Yeoman* (2003) 31 Cal.4th 93, 139 ["the presumption that jurors understand and follow instructions [is] '[t]he crucial assumption underlying our constitutional system of trial by jury' "].)  Because the jury did not find fraud or that defendants intended to deceive plaintiff, it necessarily found defendants grossly negligent.

The record supports a finding that defendants acted with gross negligence in that their conduct constituted "an extreme departure from what a reasonably careful person would do in the same situation to prevent harm to oneself or to others." (CACI No. 425.)  Sawyer, defendants' employee, knew exposing inert asbestos to the elements could make it friable and was concerned that plaintiff's renovation of Range 9 would expose asbestos to the elements but never expressed his concerns to the principals.  After Range 9 suffered storm damage, Sawyer had an asbestos remediation company do the repairs, even though the lease agreement made plaintiff responsible for the repairs, but never informed plaintiff about his concern that asbestos might have been released.  Ultimately, the County of San Diego quarantined Range 9 based on friable asbestos in the air and on the ground.  Sawyer's failure to

12

inform plaintiff about his concerns necessarily resulted in plaintiff's employees and property being exposed to friable asbestos because plaintiff continued to use Range 9 until the County of San Diego quarantined the building.

The trial court concluded the jury did not find gross negligence because plaintiff failed to put a special verdict before the jury to obtain such a finding. The trial court cited no authority that a special verdict form is required for gross negligence. Defendants similarly fault plaintiff for not submitting a special verdict form addressing gross negligence, arguing it was plaintiff who raised gross negligence as a defense to the enforceability of the lease agreement. Defendants also failed to cite any authority that a special verdict form addressing gross negligence was required and we found no such authority. Interpreting the special verdicts in connection with the pleadings, evidence, and instructions, the jury understood it could not award damages to plaintiff unless it found defendants grossly negligent. By awarding plaintiff damages the jury necessarily found defendants grossly negligent. Thus, the indemnification clause (section 10.1) does not bar plaintiff's damages award.

B. *The Limitation of Liability Clause Does Not Bar Plaintiff's Damages*

1. The Health and Safety Code

One of the primary purposes of the Carpenter-Presley-Tanner Hazardous Substance Account Act (the Act; Health & Saf. Code,[3] § 25300 et seq.)[4] was to "[e]stablish a program to provide for response authority for

---

[3] All undesignated statutory reverences are to the Health and Safety Code.

[4] Effective January 1, 2024, the Legislature recodified and reorganized the Act without substantive changes. (2022 Cal. Legis. Serv. Ch. 257 (Assem. Bill No. 2293).) All references to the Act are to the statutes as they existed prior to January 1, 2024.

releases of hazardous substances, . . . that pose a threat to the public health or the environment." (§ 25301.) Asbestos is a hazardous air pollutant (§ 25316, subd. (e); see also, 42 USCA § 7412, (a)(6) & (b)) and a "known carcinogen when inhaled." (*McNeal v. Whittaker, Clark & Daniels, Inc.* (2022) 80 Cal.App.5th 853, 857.) Any owner of *nonresidential* real property who *knows or has reasonable cause to believe* that a release of hazardous substance has come to be located on or below the property" must before leasing the property, give the lessee written notice of the condition. (§ 25359.7, subd. (a), italics added.) "Failure of the owner to provide written notice when required by this subdivision to the . . . lessee, or renter shall subject the owner to actual damages and any other remedies provided by law." (*Ibid.*)

Additionally, the Asbestos Notification Law (§ 25915 et seq.) sets forth a scheme for notifying employees, contractors and other persons providing services on a property of the presence of asbestos on that property. When construction, maintenance, or remodeling is to be conducted in an area of the leased premises where there is the potential for employees to encounter asbestos or asbestos-containing materials, the owner responsible for the construction, maintenance, or remodeling must post a written warning. (§§ 25915.5, subd. (a), 25916.) The posted warning sign must state either: "CAUTION. ASBESTOS. CANCER AND LUNG DISEASE HAZARD. DO NOT DISTURB WITHOUT PROPER TRAINING AND EQUIPMENT." Or "DANGER. ASBESTOS. CANCER AND LUNG DISEASE HAZARD. AUTHORIZED PERSONNEL ONLY. RESPIRATORS AND PROTECTIVE CLOTHING ARE REQUIRED IN THIS AREA." (§ 25916, subds. (a) & (b).) "Any owner who knowingly or intentionally fails to comply with this chapter, or who knowingly or intentionally presents any false or misleading

14

information to employees or any other owner, is guilty of a misdemeanor punishable by a fine of up to one thousand dollars ($1,000) or up to one year in the county jail, or both." (§ 25919.7.)

An "owner" includes any lessee of a building or part of a building. (§ 25919.5.) Accordingly, plaintiff and defendants qualify as owners. An "employee" includes "any person contracting with an owner who is required or directed to perform services . . . in any building." (§ 25919.3.) Thus, plaintiff who "contract[ed] with an owner" through the lease agreement falls within the statutory definition of employees working within the building entitled to notice under section 25919.5. (§ 25919.3.)

### 2. The Jury Necessarily Found a Violation of Law

Negligence per se is a way to establish ordinary negligence by tying the standard of care to a specific "statute, ordinance, or regulation of a public entity." (Evid. Code, § 669, subd. (a)(1).) "Negligence per se is an evidentiary doctrine, rather than an independent cause of action. [Citation.] It can be applied generally to establish a breach of due care under any negligence-related cause of action." (*Jones v. Awad* (2019) 39 Cal.App.5th 1200, 1210.) Where the doctrine of negligence per se is applicable, the standard of conduct established by a relevant statute or ordinance is adopted as the duty of care for purposes of a negligence cause of action. (*Ibid.*) In such cases, where the statute or ordinance is violated, the doctrine creates a rebuttable presumption of negligence. (*Ibid.*)

The trial court stated "[t]he parties seem to be in general agreement that the negligence in this case was established via the doctrine of negligence

15

per se."[5] We agree with this observation because the sole negligence theory plaintiff presented was defendants' alleged failure to comply with their statutory duty to inform plaintiff of the existence of asbestos before entering the lease, when plaintiff renovated the property, and when defendants hired a company to repair the property. The court noted, however, that "[t]he actual verdict provided does not specify that [defendants] violated a statute. It also does not specify that the jury applied the negligence per se doctrine. All the verdict form specifies is that [defendants were] indeed 'negligent in the use or maintenance of the property.' " The trial court cited no authority that a special verdict form is required to address a negligence per se theory of liability. Defendants also failed to cite any authority that a special verdict form addressing negligence per se was required and we found no such authority.

Defendants' reliance on *Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, for the proposition that plaintiff was required to obtain special verdicts on negligence per se and gross negligence is misplaced. In *Myers*, by special verdict a jury found defendant had breached its contract with plaintiff. (*Id.* at p. 956.) The jury also found, by special verdict, that there had been "oppression, fraud or malice" in defendant's conduct toward plaintiff and awarded plaintiff punitive damages. (*Ibid.*) Although plaintiff had alleged a cause of action for fraud, no special verdict findings were submitted to the jury on this cause of action. (*Id.* at p. 958.) However, the law is clear that "[a]n award of punitive damages is not supported by a verdict based on breach of contract, even where the

---

[5] In their motion for JNOV, defendants stated the jury found they were "negligent per se in not disclosing to [plaintiff] the presence of asbestos in Range 9 as called for by the Health and Safety Code."

16

defendant's conduct in breaching the contract was wilful [*sic*], fraudulent, or malicious." (*Id.* at p. 960; Civ. Code, § 3294.) Accordingly, the appellate court struck the punitive damages award. (*Myers*, at p. 962; see also, *Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 324–329 [court could not speculate jury found defendant committed battery where jury received no special verdict form on battery cause of action and instructions did not address lack of consent].) Here, unlike the fraud claim in *Myers*, gross negligence and negligence per se are not separate causes of action.[6]

Interpreting the special verdicts in connection with the pleadings, evidence, and instructions, the jury necessarily found defendants negligent based on statutory violations under the doctrine of negligence per se because this was the only theory upon which the jury could base its negligence finding. (*Woodcock*, *supra*, 69 Cal.2d at p. 456.)

C. *The Limitation of Liability Clause Does Not Preclude the Damages Award*

"Generally, 'a limitation of liability clause is intended to protect the wrongdoer defendant from unlimited liability.' " (*Food Safety Net Services v. Eco Safe Systems USA, Inc.* (2012) 209 Cal.App.4th 1118, 1126.) Such clauses "have long been recognized as valid in California." (*Markborough Cal. v. Superior Court* (1991) 227 Cal.App.3d 705, 714.) Parties to a commercial lease may agree to limit liability for breaches of covenants in the lease. (*Frittelli, Inc. v. 350 North Canon Drive, LP* (2011) 202 Cal.App.4th 35, 43 (*Frittelli*).) To the extent an exculpatory provision also attempts to

---

[6] We do not conclude that special verdict forms addressing gross negligence or negligence per se are improper. We only conclude the absence of such special verdict forms does not constitute error on this record where the pleadings, evidence, and jury instructions allowed the trial court to draw conclusions of law based on the jury's negligence finding. (Code Civ. Proc., § 624.)

shield a party from tort liability, it is subject to the public policy expressed in Civil Code section 1668 which provides that " ' "[a]ll contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his [or her] own fraud, or willful injury to the person or property of another, or *violation of law, whether willful or negligent*, are against the policy of the law." ' " (See *Frittelli*, at p. 43, italics added.) Civil Code section 1668 has been construed to invalidate contractual provisions that purport to exempt liability for future intentional wrongs and gross negligence and prohibits provisions exempting ordinary negligence when the public interest is involved *or a statute expressly forbids it*. (*Ibid.*) Civil Code section 1668 also applies "to invalidate provisions that merely limit liability." (*Health Net of California, Inc. v. Department of Health Services* (2003) 113 Cal.App.4th 224, 239.) "[C]ontractual clauses seeking to limit liability will be strictly construed and any ambiguities resolved against the party seeking to limit its liability . . . ." (*Nunes Turfgrass, Inc. v. Vaughan–Jacklin Seed Co.* (1988) 200 Cal.App.3d 1518, 1538.)

As we discussed, the jury necessarily found defendants liable for damages based on their violations of the Health and Safety Code in failing to disclose the existence of asbestos in Range 9 under a negligence per se theory. (*Ante*, pt. II.B.2.) This finding triggered Civil Code section 1668 which invalidates "contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own . . . violation of law, whether willful or negligent. . . ." (Civ. Code, § 1668.) Accordingly, the limitation of liability clause (section 10.6) is void to the extent it purports to shield defendants from liability for their willful or negligent statutory violations.

The trial court, however, concluded Civil Code section 1668 did not apply to invalidate the limitation of liability clause because even assuming

18

the jury found defendants violated the Health and Safety Code, the " 'violation of law' prong set forth in . . . [Civil Code section] 1668 applies to cases involving the public interest, injuries to persons, or the like—it is not designed to prevent 'two equal bargainers' in a commercial setting from allocating who 'should bear the risk of economic loss in the event of a particular mishap,' and 'there is no reason for the courts to intervene and remake the parties' agreement' in such situations." We conclude the trial court erred.

"Disclosure requirements are commonplace even for commercial transactions between sophisticated business entities, and all such laws reflect legislative judgments as to what information should be available for market participants to consider when negotiating or agreeing to a contract, even when one party 'could easily contract to secure that information' from the other party." (*Beeman v. Anthem Prescription Management, LLC* (2013) 58 Cal.4th 329, 362 (*Beeman*).) Disclosure statutes "simply require disclosure of factual information in order to inform private or public decisionmaking in the economic or political marketplace. We may assume that the regulated entities would prefer not to make these disclosures, many of which run counter to their business interests. But the Legislature has determined that the information should be made available in order to promote informed choice in the free market and in the development of sound public policy." (*Id.* at p. 361.)

As examples of such disclosure statutes, in *Beeman*, the Supreme Court cited several statutes, including subdivision (a) of section 25359.7 which requires an owner of nonresidential real property to give written notice to buyers, lessors, or renters regarding the presence of hazardous substances. (*Beeman*, *supra*, 58 Cal.4th at p. 362.) Accordingly, to the extent the

19

limitation of liability clause purports to release defendants for liability for failing to disclose asbestos it violates public policy.

The trial court's reliance on *Tunkl v. Regents of University of Cal.* (1963) 60 Cal.2d 92 was misplaced because *Tunkl* only addressed the validity of contractual clauses seeking to avoid responsibility for ordinary negligence. (*Id.* at pp. 94, 101.) As the court in *Capri v. L.A. Fitness International, LLC* (2006) 136 Cal.App.4th 1078 (*Capri*) explained: "*Tunkl* did not, however, add a 'public interest' requirement where the contract purports to avoid liability for fraud, willful injury, or violation of law, whether intentional or negligent. The plain language of [Civil Code] section 1668 renders such exculpatory provisions invalid as against public policy, and nothing in *Tunkl* alters that. 'It is now settled—and in full accord with the language of the statute—that notwithstanding its different treatment of ordinary negligence, under [Civil Code] section 1668, "a party [cannot] contract away liability for his fraudulent or intentional acts or for his negligent violations of *statutory* law,' regardless of whether the public interest is affected.' " (*Id.* at p. 1084.) Here, because the jury found a violation of statutory law, *Tunkl*'s public interest requirement does not apply.

The trial court similarly misplaced its reliance on *CAZA Drilling (California), Inc. v. TEG Oil & Gas U.S.A., Inc.* (2006) 142 Cal.App.4th 453, *Farnham v. Superior Court* (1997) 60 Cal.App.4th 69, and *Peregrine Pharms., Inc. v. Clinical Supplies Mgmt.* (C.D. Cal. 2014) 2014 U.S. Dist. LEXIS 105756 (*Peregrine*). *Caza* is distinguishable because appellants failed to identify a specific statutory or regulatory violation that led to their injury that would trigger the application of Civil Code section 1668. (*Caza*, at p. 476.) Thus, no basis existed to invalidate the exculpatory provisions in the parties' contract. (*Ibid.*) In contrast here, plaintiff proved a violation of the

20

Health and Safety Code. *Farnham* is distinguishable because the contract limited the liability of corporate directors for defamation arising out of their roles as directors while allowing the injured party to seek full redress from the corporation. (*Farnham*, at p. 77.)

In *Peregrine, supra,* 2014 U.S. Dist. LEXIS 105756,[7] the court concluded the limitation on damages provisions shielded defendant for passive negligence, not active negligence which includes " 'knowledge of or acquiescence in negligent conduct, or failure to perform specific duties.' " (*Id.* at p. 42.) In contrast, this case involves gross (active) negligence. *Peregrine* is also distinguishable because the parties, two pharmaceutical companies, foresaw the importance of compliance with FDA regulations and apportioned the risk for violations of law. (*Id.* at p. 51.) In contrast here, the limitation of liability clause does not address asbestos and defendants do not explain how two commercial actors can fairly allocate risk for asbestos where one of the parties did not even know of the risk.

In summary, defendants' failure to comply with disclosure requirements contained in the Health and Safety Code prevented plaintiff from knowing about latent hazardous materials at the premises which plaintiff had no way of discovering on its own. Defendants' statutory violations led directly to plaintiff's financial losses. Thus, to the extent the limitation of liability clause exculpates defendants for their violations of the Health and Safety Code, it is invalid under Civil Code section 1668. Accordingly, the trial court erred in granting JNOV in defendants' favor.

---

[7] "Although not binding, unpublished federal district court cases are citable as persuasive authority." (*Aleman v. Airtouch Cellular* (2012) 209 Cal.App.4th 556, 576, fn. 8.)

### III. DEFENDANTS' APPEAL

A. *Additional Background*

Brian Brinig, a certified public accountant who specializes in forensic accounting, testified regarding plaintiff's alleged economic losses due to the loss of its orchid inventory in March 2017. He determined plaintiff generated approximately $478,000 in gross sales income in 2015 and $485,000 in 2016. Brinig assumed that in 2017, 2018, and 2019, the business would have produced the same level of revenue it produced in the year prior to the inventory loss. He averaged the revenue amount for the prior two years and estimated $480,000 in gross sales for these years. Based on prior sales and profits, Brinig subtracted 35 percent from lost revenue to calculate lost profit. That resulted in net lost profit of $83,000 in 2017, $165,000 in 2018, and $121,000 in 2019." Total net lost profit for "all three of those years is $368,933" under Brinig's preferred calculation method.

As a second method of calculating lost profits, Brinig multiplied the number of plants lost by the value of each plant. In March 2017, plaintiff had approximately 16,200 orchid plants growing at Range 9 valued at $18.50 to $22.50 each, of which, 50 percent were in bloom and ready for sale. Mr. Le lacked inventory records confirming this amount and indicated there may have only been 12,000 plants at Range 9. Brinig testified that if plaintiff had 12,000 plants at an average of $20 per plant, plaintiff lost $240,000. If plaintiff had 16,200 plants, then it lost $324,000.

Under a third approach, Brinig took the lost profit for each year "and you add that calculation of lost profit back to the adjusted net income for the business in each of the years 2017, '18, and '19." The adjusted net income in 2016 was $116,000, in 2017 it was around $50,000, or $133,000 when added to Brinig's estimate of the loss for that year ($82,000). In 2018 the adjusted

22

net income was $135,000 and $161,000 for 2019. Those three numbers add up to over $400,000.

Mr. Le claimed plaintiff's losses exceeded what Brinig calculated because Brinig's method only reflected profits and losses from plaintiff's tax returns. Additionally, plaintiff sold orchid stems, which can take eight months or so to fully bloom. Mr. Le estimated that about 60 percent of the plants cultivated get used multiple times for cut stems. One cut stem, which a single plant can produce multiple times, sells for $9 to $12 per stem. Additionally, plaintiff had buyers for the asbestos-contaminated orchids and had to replace these plants at almost triple the cost which also impacted plaintiff's net profit.

Defendants also presented a damages expert who reviewed Brinig's work product and testimony. Defendants' expert opined that Brinig's calculations were unsupported mathematical exercises that did not reflect plaintiff's actual damages. He also opined that Brinig's damage calculations were not consistent with what he believed were plaintiff's potential losses. Finally, he concluded Brinig had not received "sufficient and accurate accounting and financial information" to support his opinions regarding plaintiff's damages. Defendants' expert criticized Brinig for not taking into account that some of the lost plants were intended to be retained for cut stems. As an example, if 50 percent of the lost plants were intended to be retained, then the total lost sales would be about $125,000. Defendants' expert also criticized Brinig for not analyzing whether plaintiff could have mitigated its damages.

The trial court instructed the jury that plaintiff sought economic damages resulting from lost profits. In deciding lost profits, the jury was told it needed to determine the gross amount plaintiff would have received but for

23

defendants' conduct and subtract from that the amount of additional costs plaintiff would have had if defendants' conduct had not occurred. Additionally, the jury was informed that "[t]he amount of the lost profits need not be calculated with mathematical precision, but there must be a reasonable basis for computing the loss." The verdict form contained blank spaces for "[l]ost profits" and "[o]ther past economic loss." The jury awarded damages $144,300 as lost profits and $77,700 as other past economic loss, for a total damages award of $222,000.

Defendants requested a partial JNOV challenging the jury's award of $77,700 for "other past economic loss" on the ground plaintiff submitted no damage evidence except for "lost profits," and there is no evidentiary support in the record for "other past economic loss." The trial court disagreed with defendants' argument but ruled the issue was moot based on the limitation of liability clause.

B. *Substantial Evidence Supports the Damages Award*

Defendants note that Brinig presented a lost profits model of damages and the record contains no evidence of any damages besides lost profits. Accordingly, they contend substantial evidence does not support the jury's award of $77,700 in "other past economic loss." Indulging all inferences in favor of the jury's verdict, plaintiff asserts the evidence supported the "other past economic loss" damage award. Because the record contains evidence showing it suffered over $300,000 in damages, plaintiff argues the jury's $220,000 damages award should be affirmed.

Reduced to its essence, defendants argue that because the special verdict form included two blanks, one for "[l]ost profits" and another for "[o]ther past economic loss" that "[o]ther past economic loss" must be something other than lost profits. Stated differently, the special verdict form

24

is ambiguous as to whether "[o]ther past economic loss" is something different than lost profits. Defendants, however, did not object to the question regarding "[o]ther past economic loss" in the trial court.[8] Moreover, any confusion as to whether "[o]ther past economic loss" is something different than lost profits could have been clarified after the jury returned its verdict and before the jury was discharged. (See Code Civ. Proc., § 619 ["When the verdict is announced, if it is informal or insufficient, in not covering the issue submitted, it may be corrected by the jury under the advice of the Court, or the jury may be again sent out."].) Instead, defendants gained a tactical advantage by waiting to raise this issue for the first time in its motion for JNOV.

In any event, any ambiguity as to whether "[o]ther past economic loss" is something different than lost profits must be resolved considering the pleadings, evidence, and instructions. (*Woodcock, supra*, 69 Cal.2d at p. 456.) As defendants correctly note, Brinig presented only a lost profits model of damages and calculated plaintiff's damages at a minimum of $240,000 and over $360,000 using three different methods to determine plaintiff's lost profits. The instructions informed the jurors that plaintiff sought only lost profit damages. We are required to presume the jury followed the trial court's instructions in the absence of contrary evidence. (*Cassim, supra*, 33 Cal.4th at pp. 803–804.) Neither party submitted a proposed jury instruction defining "[o]ther past economic loss" and the jury received no such instruction. Thus, the jury could have reasonably concluded from the

---

[8] The proposed damages verdict forms submitted by both plaintiff and defendants included two blank spaces, one for "[l]ost profits" and another for "[o]ther past economic loss."

25

instructions that "[o]ther past economic loss" was simply a different form of lost profits.

Significantly, under Brinig's third approach, he calculated damages by taking lost profits for 2017, 2018, and 2019 and adding that to the adjusted net income for the business for each of these three years. Under this approach, and crediting the evidence that 60 percent of the plants plaintiff grew were for cut stems, the jury could have reasonably interpreted "[o]ther past economic loss" as being plaintiff's lost profits for 2017 when plaintiff lost its plant inventory and "[l]ost profits" as being plaintiff's lost profits after 2017, or the value of the cut stems.

In summary, the evidence presented to the jury was sufficient to provide a reasonable basis for calculating the amount of plaintiff's lost profits. That defendants agreed to a special verdict form containing a blank space for "other past economic loss" without requesting a jury instruction defining this term is a problem of their own making. Indulging in every legitimate inference to support the verdict, as we must, substantial evidence supports the damages awarded for "other past economic loss." Thus, the trial court properly denied defendants' motion for partial JNOV.

DISPOSITION

On plaintiff's appeal, the order granting JNOV in defendants' favor is reversed. On defendants' cross-appeal, the order denying partial JNOV on the issue of damages is affirmed. The matter is remanded for further proceedings consistent with this opinion. Plaintiff is awarded its costs on appeal.


KELETY, J.

WE CONCUR:


HUFFMAN, Acting P. J.


O'ROURKE, J.

Filed 1/25/24

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| EPOCHAL ENTERPRISES, INC., <br><br>     Plaintiff, Cross-defendant and Appellant, <br><br>     v. <br><br> LF ENCINITAS PROPERTIES, LLC, et al., <br><br>     Defendants, Cross-complainants and Appellants. | D079905 <br><br><br> (Super. Ct. No. 37-2018-00027797-CU-CO-NC) <br><br> ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion in this case filed on January 12, 2024, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

HUFFMAN, Acting P. J.

Copies to:  All parties

2